*Decisions will be entered under Rule 50.*

ELMER IRVIN TRUST, ELMER IRVIN, TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65495. Filed February 14, 1958.

*W. A. Gossage, Jr., Esq.*, for the petitioner.
*Sylvan Siegler, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined a deficiency in income tax of the petitioner for the taxable year 1951 in the amount of $751.29. The single issue before us is whether petitioner, Elmer Irvin Trust, during the taxable year 1951, was an association taxable as a corporation, as determined by the respondent.

### FINDINGS OF FACT.

Some of the facts were stipulated and are found accordingly.

On April 2, 1951, the Elmer Irvin Trust, hereinafter referred to as the petitioner, was created by a declaration of trust executed by Mary E. Brown, creator, and Vernon K. Irvin, Robert L. Irvin, and Mary E. Brown, acceptors and trustees. On April 3, 1951, the declaration of trust was signed and sworn to by Elmer Irvin as trustee.

The principal place of business for petitioner was listed as the city of Goodland, county of Sherman, and State of Kansas. Petitioner timely filed a fiduciary income tax return (Form 1041) for the taxable year 1951 with the then collector of internal revenue for the district of Kansas. The tax return showed total income of $6,538.47, total expenses of $4,054.03, and a resulting profit of $2,484.44. The return further showed the amount of $5,146.53 as distributable to beneficiaries, resulting in no net income being taxable to the fiduciary.

The "trust" instrument under which petitioner was created, was a form prepared and distributed by an organization known as the National Pure Trust Service. The instrument was described as a "DECLARATION OF TRUST" and authorized the trustees to operate under the name of the Elmer Irvin Trust. It was provided that Mary E. Brown, Vernon K. Irvin, and Robert L. Irvin, acceptors in joint tenancy and children of Elmer Irvin, should compose the board of trustees and executive officers for conducting the business of the trust.

The instrument provided for the appointment of a specified number of trustees, the term of office to be held by them, and the manner in which they could be removed and successor trustees appointed. Provisions were made for trustees' meetings, and a majority vote was necessary for the conduct of business. The trustees were empowered to exercise exclusive management of the trust property and business affairs. Provisions were made for the election or appointment of a successor trustee in the event of death of any of the present trustees.

The trustees were empowered to elect from among themselves a president, secretary and treasurer, or any other officer. The trustees were authorized to fix and pay the compensation for officers, employees, or agents of the petitioner.

The instrument authorized the trustees, in whom the property of the trust vested, to enter into and conduct any imaginable business or enterprise under the name of Elmer Irvin Trust. The trustees were to be guided by the instrument, resolutions of the trustees as recorded in the minutes, or by bylaws, rules, or regulations, as are deemed expedient and consistent with the orderly conduct of business.

Negotiable certificates of interest were issued. On these certificates, and also in the trust instrument, it was provided that neither the trustees nor the beneficiaries were liable in contract or in tort beyond the assets of the trust. It was provided that neither death, insolvency, or bankruptcy of any certificate holder, or the transfer of his certificate by sale, gift, devise, or descent, shall affect the operation of the trust.

At the first meeting of the trustees (as shown by the minutes of said meeting), it was provided for the creation of a general manager whose duties were described as being analogous to a "President, Chairman of

the Board and General Manager." Elmer Irvin was elected to this office and as such, ran the business of the trust in the year before us.

On April 23, 1951, Elmer Irvin conveyed certain property to the trust in accordance with the terms of the trust instrument. The property consisted primarily of unimproved farmland, a business building, vacant lots, and a small house. The income received by the trust in 1951 was primarily rental payments. All of such income was distributed to, or was retained by, Elmer Ervin.

In the statutory notice of deficiency, respondent determined that petitioner was an association taxable as a corporation. Certain other adjustments were conceded by the petitioner. During the taxable year 1951, petitioner was an association taxable as a corporation.

### OPINION.

Our only issue is whether, during 1951, petitioner was an association taxable as a corporation.

By statutory definition, the term "corporation" includes "associations." Sec. 3797 (a) (3), I. R. C. 1939. Many opinions of this and other courts have given some precision to the meaning of the term "association." Most prominent among these opinions are *Morrissey* v. *Commissioner*, 296 U. S. 344, and three companion cases decided by the Supreme Court on the same date.[1] See also Regs. 111, sec. 29.3797–2.

Two major considerations in determining that a trust is an association which should be taxed as a corporation evolve from the cited cases and regulations. First, it must be found that the purpose for which the trust was organized was to associate together in a joint enterprise for the transaction of business. Then it must be found that the organization resembled a corporation. As was stated in the *Morrissey* case, *supra*, the "inclusion of associations with corporations implies resemblance; but it is resemblance and not identity." Some of the salient features of a trust, created as a medium for carrying on a business enterprise, which make it analogous to a corporate organization are suggested in the *Morrissey* case, *supra*. They are in part: Trust property vested in trustees, as a continuing body with provision for succession or self-perpetuation; centralized management; trustees who are authorized to act in much the same way as directors; trust not affected by death, resignation, etc., of owners of beneficial interests; negotiability of beneficial interests; and limited liability of members of the trust.

Applying these principles to the instant case, it is so obvious that the trust in question is such an association that little discussion is

---

[1] *Swanson* v. *Commissioner*, 296 U. S. 362; *Helvering* v. *Combs*, 296 U. S. 365; and *Helvering* v. *Coleman-Gilbert Associates*, 296 U. S. 369.

merited. As to the purposes for which the trust was created, we must find that purpose from the instrument itself. *Helvering* v. *Coleman-Gilbert Associates, supra.*

The instrument with which we are dealing is a copyrighted, printed instrument prepared by the National Pure Trust Service. It is provided that it is to be administered by "NATURAL PERSONS, HOLDING TITLE IN JOINT TENANCY, ACTING UNDER THEIR CONSTITUTIONAL RIGHTS AS CITIZENS OF THE UNITED STATES OF AMERICA." The masthead on each page of the instrument shows an eagle perched on an open book, in which it is written "U. S. CONSTITUTIONAL PROTECTION FOR HOME BUSINESS FAMILY ESTATE."

The body of the instrument is a wilderness of high-sounding words and phrases, obviously designed as selling points for the service by the author, rather than to serve a genuine trust need. It is solemnly proclaimed that the "Purport" of the instrument is to convey property to trustees "to provide for a sane and economical administration by natural persons acting in a fiduciary capacity," the parties thereto "preferring that the Trustees act solely within their constitutional rights as based upon their common law rights and immunities vouchsafed to citizens of the United States of America and defined . in Article IV, Section 2 [quoting], and Article VI, Section 2 [incorrectly quoting a portion of the Article]; and the 14th Amendment thereof, PROVIDING, that 'No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.' "

We refrain from extensive quotes from the 11-page printed instrument but feel that we must set out the following paragraph:

Trustees' powers shall be construed as general powers of citizens of the United States of America, to do anything any citizen may do in any state or country, subject to the restrictions herein noted. They shall continue in business, conserve the property, commercialize the resources, extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of this Trust, such as, viz.: buy, sell or lease land for surface or mineral rights; buy or sell mortgages, securities, bonds, notes, leases of all kinds, contracts or credits, of any form, patents, trademarks or copyrights; buy, sell, or conduct mail-order business, or branches thereof, operate stores, shops, factories, warehouses, or other trading establishments or places of business of any kind, construct, buy, sell, lease or rent suitable buildings or other places of business; advertise different articles or business projects; borrow money for any business project, pledging the Trust property for the payment thereof; hypothecate assets, property, or both, or the Trust in business projects; own stock in, or entire charters of corporations, or other such properties, companies or associations as they may deem advantageous.

As if the above quote is not deemed a broad enough grant of power to enter and conduct any conceivable business, there is added this neat little clause: "Resolutions of the Board of Trustees authorizing a

special thing to be done shall be evidence that such act is within its powers." Under similar powers granted to a corporation, it would have been virtually impossible for the corporation to have committed an ultra vires act.

As to the similarity of form of the instant trust to a corporation, we have found that the title to the properties was vested in the trustees; centralization of management was effected by directing that the collective action of the trustees was to exercise exclusive control of the property and business affairs, and further, the office of general manager was created, whose duties were described as analogous to "a President, Chairman of the Board and General Manager." There were provisions setting the number and term of office of trustees, the manner in which they were to be removed from office, appointed, or elected. There were provisions whereby the effective operation of the trust would not be affected by the death, resignation, or removal of any trustee. Negotiable certificates of interest were issued and the liability of the trustees, officers, or agents was strictly limited to the assets of the trust on such certificates as well as on the declaration of trust.

It would serve no useful purpose to further detail the ridiculously worded instrument. It is perfectly obvious that the Elmer Irvin Trust is even more similar in form to a corporation than the organization in the *Morrissey* case, *supra*. We think that the trust instruments in evidence conclusively demonstrate that in substance as well as in form the petitioner falls within that category of associations to be taxed as corporations within the meaning of section 3797 (a) (3) of the Internal Revenue Code of 1939.

*Decision will be entered for the respondent.*