PHILLIP G. LARSON, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5530-72, 5266-73, 5267-73.    Filed April 27, 1976.

*Stanton H. Zarrow* and *Frederick A. Richman,* for the petitioners.

*Nicholas G. Stucky,* for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in Federal income tax as follows:

| Docket No. | Petitioner | Taxable year | Deficiency |
|---|---|---|---|
| 5530-72 | Phillip G. Larson _____ | 1968 | $6,744 |
| 5266-73 | American Precision Metals _____ | 1969 | 3,703 |
| | | 1970 | 1,810 |
| 5267-73 | Phillip G. Larson _____ | 1966 | 1,409 |
| | | 1969 | 5,943 |
| | | 1970 | 6,389 |

---

[1] The following proceedings are consolidated herewith: American Precision Metals, docket No. 5266-73, and Phillip G. Larson, docket No. 5267-73.

Other issues having been disposed of by mutual agreement of the parties, the sole issue remaining for decision is whether the limited partnerships involved in this proceeding constitute associations taxable as corporations within the meaning of section 7701(a)(3).[2]

An opinion was filed in this case on October 21, 1975. On November 5, 1975, petitioners filed a "Motion for Reconsideration by the Full Court" which was denied. The motion was referred to the trial judge as a motion for reconsideration of the opinion. The trial judge granted this motion and the Court's opinion was withdrawn on November 7, 1975.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. Such facts and the exhibits attached thereto are incorporated herein by this reference.

Phillip G. Larson, petitioner in docket Nos. 5530-72 and 5267-73 (hereinafter petitioner), was a legal resident of Burlingame, Calif., at the time he filed his petitions herein. Petitioner filed Federal individual income tax returns for the calendar years 1968 to 1970, inclusive, with the Internal Revenue Service Center at Ogden, Utah. During the taxable years 1968, 1969, and 1970, petitioner was a limited partner in Mai-Kai Apartments (hereinafter Mai-Kai), a limited partnership formed under the laws of the State of California. During the taxable year 1970, petitioner was also a limited partner in Somis Orchards (hereinafter Somis), a limited partnership formed under the laws of the State of California.[3]

American Precision Metals, petitioner in docket No. 5266-73 (hereinafter referred to as American), was a corporation with its principal office in Burlingame, Calif., at the time it filed its petition herein. American filed its Federal corporation income tax returns for the calendar years 1969 and 1970 with the District Director of Internal Revenue at San Francisco, Calif. American was a limited partner in Somis during 1969 and 1970.

---

[2] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[3] The parties agreed by stipulation that the use of the terms "partner" or "partnership," alone or in conjunction with the words "limited" or "general," refers to the descriptive designations of the entities and their members under the law of the State of California, and is not intended to characterize their status for purposes of the Federal income tax.

Grubin, Horth & Lawless, Inc. (hereinafter GHL), a California corporation, the sole general partner of both Mai-Kai and Somis, was formed April 2, 1968, primarily to organize so-called "real estate syndications" as limited partnerships under the laws of the State of California. GHL kept its books on the basis of a fiscal year ending March 31. GHL had a paid-in capital of $21,300. From its incorporation to March 31, 1974, its capital and surplus ranged between a maximum of $49,593 at the close of the fiscal year 1970 to a minimum of $18,764 as of the close of the fiscal year 1974. Cash on hand was generally negligible. GHL organized both Mai-Kai and Somis and managed and administered the partnership properties. The assets and liabilities of GHL, as shown by its tax returns, may be summarized as follows:

| | | FYE Mar. 31— | | |
|---|---|---|---|---|
| Assets[1] | 1969 | 1970 | 1971 | 1972 |
| Cash | $8,756 | 0 | 0 | 0 |
| Accounts receivable: | | | | |
| Partnerships | 11,435 | $12,661 | | |
| Partners | 12,400 | 50,000 | $48,780 | $32,779 |
| Other | 153 | 66,769 | | |
| Other current assets | | 100 | 2,901 | 200 |
| Loans to stockholders | 926 | | | |
| Other investments | | 2,500 | | |
| Depreciable assets | 913 | 4,924 | 9,908 | 9,908 |
| Accumulated depreciation | (54) | (851) | (2,112) | (3,690) |
| Intangible assets | 376 | 376 | 376 | 376 |
| Accumulated amortization | (75) | (150) | (225) | (300) |
| Total assets | 34,828 | 136,331 | 59,627 | 39,273 |
| | | | | |
| Liabilities | | | | |
| Accounts payable | 1,058 | | | |
| Mortgages and notes payable | 10,176 | 44,500 | | |
| Other current liabilities | 237 | 42,238 | 39,383 | 14,619 |
| Loans from stockholders | 1,577 | | | |
| Total liabilities | 13,048 | 86,738 | 39,383 | 14,619 |
| Capital stock | 21,300 | 21,300 | 21,300 | 21,300 |
| Retained earnings | 480 | 28,293 | (1,056) | 3,353 |
| Total equity | 21,780 | 49,593 | 20,244 | 24,653 |

[1] Small errors in the stipulated column totals have not been explained.

Mai-Kai was formed on or about November 26, 1968, under the limited partnership provisions of California Corporations Code sections 15501-15531, for the purpose of owning and

operating a student apartment complex in Arcata, Calif., known as the Mai-Kai Apartments. Upon the formation of Mai-Kai, GHL transferred to Mai-Kai, as a contribution to its capital, the right to acquire the Mai-Kai Apartments under a contract negotiated by Legrand Capital Corp., GHL's predecessor in interest. The apartments were located across the street from Humboldt State College in Arcata. The apartments were designed as a student residence catering to Humboldt State students. The apartments consisted of 55 units, each accommodating four students, and a three-bedroom house which was customarily leased to six students.

GHL was not required to make any further capital contributions to Mai-Kai. The limited partnership interests in Mai-Kai were divided into 10 "units" of $9,500 per "unit." All of the "units" were sold to a total of eight limited partners. The total capital contribution to Mai-Kai by the limited partners was $95,000 in cash. GHL's total capital contribution to Mai-Kai was reflected and carried at zero ($0) on Mai-Kai's books and records.

GHL and the limited partners in the Mai-Kai venture subscribed to an agreement of limited partnership which defined their respective rights and obligations. Concurrently with the execution of the agreement of limited partnership, the Mai-Kai partners also executed a certificate of limited partnership which was filed and recorded in accordance with California law.

After its formation, Mai-Kai purchased the Mai-Kai Apartments from Century Land Co., a California corporation, for a purchase price of $450,000. The purchase price was paid by the execution of a promissory note dated November 17, 1968, in the amount of $450,000 in favor of Century Land Co. The promissory note was secured by a deed of trust upon the Mai-Kai Apartments dated November 17, 1968, which was given to Century Land Co. by Mai-Kai to secure payment of the purchase price. Pursuant to section 580b of the California Code of Civil Procedure, in the event of default by Mai-Kai under the promissory note no money judgment would lie against Mai-Kai, and Century Land Co.'s remedy would be limited to requiring the sale of the Mai-Kai Apartments pursuant to the deed of trust, with the proceeds to be applied to the promissory note.

The Mai-Kai partnership agreement and certificate provided, in pertinent part:

AGREEMENT OF LIMITED PARTNERSHIP

3. *Term.*

The partnership shall commence as of December 1, 1968 and shall continue for a period of thirty three (33) years * * * unless sooner terminated as hereinafter provided for, or unless extended for such longer term as may be determined by the election of the Limited Partners entitled to sixty per cent (60%) or more of the profits of the partnership allocable to the Limited Partners.

* * *

5. *Capital Contributions.*

(a) GRUBIN, HORTH & LAWLESS, INC. shall transfer and contribute to the partnership its right to acquire the [apartments] * * *.

The General Partner shall not be required to make any capital contribution other than its right to acquire the real property * * *.

(b) * * * The total capital contribution of the Limited Partners shall be Ninety Five Thousand Dollars * * *.

6. *Rights, Duties and Obligations of the General Partner.*

(a) The partnership business shall be managed by the General Partner. In addition to those powers granted to the General Partner by law the General Partner shall have the power to execute leases, incur obligations on behalf of the partnership in connection with the business, and execute on behalf of the partnership any and all instruments necessary to carry out the intentions and purposes of the partnership, including the power to dispose of the real property or other assets of the partnership for full and adequate consideration. The General Partner shall devote such time to the business of the partnership as shall be necessary to accomplish the purposes set forth herein.

(b) *Management and Brokerage Fees.* In addition to its share of the profits and cash flow distributions, * * * the General Partner shall receive and be entitled to the following fees:

(1) A monthly management fee equal to five per cent (5%) of the gross receipts of the partnership business during each month. * * *

(2) The General Partner may obtain financing or refinancing for the partnership property on behalf of the partnership, and if successful, the General Partner shall be entitled to a mortgage loan fee not to exceed two per cent (2%) of the total amount of each loan.

(3) The General Partner shall also be entitled to reimbursement for all reasonable out-of-pocket expenses incurred by it in the management and operation of the partnership business.

* * *

7. *Withdrawal of Capital.*

No Limited Partner may withdraw his capital contribution to the partnership without the consent of the General Partner. * * *

8. *Rights, Duties, Obligations of the Limited Partners.*

(a) Except as otherwise expressly provided herein, no Limited Partner shall participate in the management of the partnership business.

(b) A Limited Partner shall have the right to withdraw his capital account upon the termination of the partnership * * *.

* * *

10. *Profits, Losses and Distributions.*

(a) *Profits.* The net profits of the partnership shall be equal to the taxable income of the partnership as shown in the partnership tax information tax return filed in accordance with the requirements of the Internal Revenue Code.

Except as provided in Paragraph 11 below, profits shall be divided as follows:

(1) Twenty Per Cent (20%) to the account of the General Partner.

(2) Eighty Per Cent (80%) to the accounts of the Limited Partners * * *.

(b) Losses. All losses of the partnership shall be allocated entirely to the Limited Partners in proportion to their capital contributions, subject however to the limitation of liability of each Limited Partner to the amount of his individual investment in the partnership. All losses of the partnership in excess of the total capital contributions of the Limited Partners shall be borne entirely by the General Partner.

(c) *Distributions.* Subject to the provisions of Paragraph 11 below, in the event of the sale of the real property, or the liquidation of the partnership, the net proceeds realized from such sale, * * * or the proceeds of any liquidation, as the case may be, and the cash flow of the partnership shall be distributed as follows:

(1) Twenty Per Cent (20%) to the General Partner.

(2) Eighty Per Cent (80%) to the Limited Partners * * *.

* * *

(e) The General Partner shall distribute the cash flow of the partnership at convenient intervals, but not less frequently than quarterly.

11. *Limitation on Allocations and Distributions to General Partner.*

Notwithstanding Paragraph 10 above, it is agreed that the General Partner shall not participate in the cash flow or profits of the project until such time as a Limited Partner (assuming 50% tax bracket) has been returned his initial investment through a combination of cash flow and operating losses * * *. For the purpose of this computation, the total after-tax investment for the Limited Partners shall be considered to be $47,500. From said amount shall be deducted 100% of the cash distribution to the Limited Partners and 50% of operating losses * * *. Added thereto shall be 50% of profits. When the after-tax investment of $47,500 has thus been reduced to zero, it will be considered that the Limited Partners have been returned their after-tax investment and thereafter the General Partner will participate in all future cash flow and profits * * *.

* * *

15. *Assignment of Partners' Interests.*

(a) *General Partner.* The General Partner shall not assign, mortgage, encumber or sell its interest as General Partner in the partnership or enter into any agreement as a result of which any firm, person or corporation shall become interested with it in the partnership * * *.

(b) *Limited Partners Right to Receive Income.* The right of a Limited Partner to receive any income from the partnership shall not be transferred, sold or assigned without the prior written consent of the General Partner. The General Partner shall not unreasonably withhold such consent.

(c) *Transfer of Capital Interest—Limited Partner.* The capital interest of a Limited Partner may not be transferred, sold or assigned by such Limited Partner except in accordance with the following provisions:

A Limited Partner who desires to sell or transfer his capital interest in the partnership shall serve written notice on the General Partner * * *. If the General Partner, within ten (10) days following receipt of such notice, in good faith determines that the purchase price offered by the proposed transferee is less than the then fair market value of the interest to be transferred, the General Partner shall have the option to notify the proposed transferor within said ten day period, that the transferor cannot effect a transfer of the interest unless he first offers the interest to the remaining Limited Partners. * * *

In the event that (i) the General Partner does not exercise its option or (ii) the remaining Limited Partners do not elect to purchase the entire interest of the proposed transferor, the transferor may effect the transfer of his interest to the proposed transferee except that as a condition precedent to the admission of the proposed transferee, such person shall execute and acknowledge such instruments as the General Partner shall deem necessary or desirable to effect such admission and to confirm the agreement of the person being admitted to be bound by all of the terms and provisions of this agreement as the same have been amended. The transferee shall pay all reasonable expenses in connection with his admission as a substituted limited partner.
* * *

17. *Termination.*

Notwithstanding anything to the contrary contained herein, the partnership shall terminate upon any of the following events:

(a) A disposition of [sic] the partnership of its entire interest in the real property.

(b) The adjudication of bankruptcy of the General Partner or otherwise as provided by the Uniform Limited Partnership Act, unless the business is continued by a General Partner elected in place thereof.

(c) A determination by the election of Limited Partners entitled to sixty per cent (60%) or more of the profits of the partnership allocable to the Limited Partners that the partnership shall terminate.

(d) The removal of the General Partner by the vote of Limited Partners entitled to sixty per cent (60%) or more of the profits of the partnership allocable to the Limited Partners. In such event, there shall be a distribution of assets * * * unless the Limited Partners, by an affirmative vote of Limited Partners owning 100% of the profits in the partnership allocable to the Limited Partners, elect to form a new partnership to continue the partnership business. * * *

## CERTIFICATE OF LIMITED PARTNERSHIP

The undersigned, desiring to form a Limited Partnership under the Uniform Limited Partnership Act * * *, hereby make the following certificate:

1. The name of the partnership shall be MAI-KAI.

2. The character of the business shall be the ownership and operation of real property.
* * *

5. The partnership shall continue for a term of approximately thirty-three (33) years.
* * *

8. Limited Partners entitled to 60% or more of the profits of the limited partnership allocable to the Limited Partners may by a vote remove the General Partner. In the event of such removal the partnership shall terminate except that by the vote of 100% of the Limited Partners a new partnership may be formed to continue the partnership business.

In the case of Mai-Kai, GHL thus had a 20-percent "subordinated" participation interest in operating profits, cash flow, and net proceeds upon the sale of partnership assets. GHL's participation interest in Mai-Kai became unsubordinated after December 31, 1972. The amount by which GHL's participation interest was subordinated prior to December 31, 1972—i.e., the amount remaining in the partners' investment accounts (which amount was to be recovered by the limited partners before GHL was entitled to participate)—was as follows:

| End of year | Subordinated amount |
|---|---|
| 1968 | $46,707 |
| 1969 | 27,692 |
| 1970 | 14,947 |
| 1971 | 1,431 |

During 1973 Mai-Kai did not generate a profit or cash flow to be distributed to either the limited partners or to the general partner.

For each of the taxable years 1968 to 1973, inclusive, Mai-Kai reported losses on its U.S. Partnership Income Tax Returns as follows:

| Year | Loss | Year | Loss |
|---|---|---|---|
| 1968 | $91,595 | 1971 | $11,169 |
| 1969 | 38,030 | 1972 | 8,378 |
| 1970 | 23,491 | 1973 | 12,520 |

On his individual U.S. income tax returns, the petitioner deducted his distributive shares of the losses reported by Mai-Kai. Respondent disallowed said deductions on the ground that Mai-Kai was an association taxable as a corporation within the meaning of section 7701(a)(3).

Somis Orchards was formed on or about November 1, 1969, under the limited partnership provisions of California Corporations Code sections 15501-15531 for the purpose of acquiring, holding, operating, improving, leasing, selling, and otherwise managing approximately 265 acres of citrus groves and related assets in Ventura County, Calif.

The citrus groves were purchased from Kaiser Aetna in 1969 for a total purchase price of $3,620,000. The purchase price was paid by $102,750 in cash and the execution of three installment notes dated December 30, 1969, in favor of Kaiser Aetna totaling $3,709,630. The first installment note was in the amount of $3,398,500. The first and second installment notes totaling $3,434,500 were nonrecourse liabilities each being secured by a deed of trust dated December 30, 1969. The third installment note was paid in full by Somis in March 1970.[4]

The citrus groves were part of a 10,000 acre property owned by Kaiser Aetna known as Rancho Las Posas. At the time of their acquisition by Somis Orchards the citrus groves were planted with lemons, grapefruit, and oranges. The property was suitable, however, for possible future residential or commercial use. Kaiser Aetna, the seller of the property, had begun the formulation of an overall master plan for the development and marketing of the entire Rancho Las Posas property. A part of the consideration paid by Somis Orchards to Kaiser Aetna for the citrus groves related to Kaiser Aetna's agreement to enhance the value of the citrus groves through Kaiser Aetna's development of the comprehensive master plan and commencement of sales and marketing activities. Somis contracted with Kaiser Aetna to have the citrus groves remain in Kaiser Aetna's master plan and for the citrus groves to be managed by Kaiser Aetna in the interim.

GHL's capital contributions to Somis consisted of the transfer to the partnership of GHL's rights to acquire the citrus groves under the purchase contract negotiated by GHL. In addition, GHL assigned to Somis the management contract negotiated by GHL for management of the citrus groves by Kaiser Aetna.

A total of 44 limited partners contributed $420,000 in cash to Somis.[5] Each limited partner also executed a series of promissory notes reflecting annual contributions to be made by the limited

---

[4] Pursuant to sec. 580b of the California Code of Civil Procedure, in the event of default by Somis Orchards under the installment notes, no money judgment would lie against Somis Orchards with respect to the first and second installment notes and with respect to the third installment note to the extent of $82,750, and Kaiser Aetna's remedy to that extent would be limited to requiring the sale of the citrus groves pursuant to the deeds of trust; however, the balance of the third installment note, $192,380, was not given as part of the purchase price of the citrus groves, and accordingly, Somis Orchards was liable therefor.

[5] Interests in Somis were sold in "units" of $10,000. Some limited partners acquired half units or more than one unit.

partners during the 8 years following the formation of Somis. Of the total 44 limited partners in Somis, 26 joined the partnership in 1969, making capital contributions totaling $265,000. The remaining 18 limited partners joined the limited partnership in 1970.

At the time Somis was formed, it was contemplated that a total of $560,000 would be raised. However, in 1970, Somis sold one-fourth of the citrus groves to L. T. Anderson Construction Co. and L. T. Anderson, who executed and delivered to Kaiser Aetna their promissory notes for that portion of the citrus groves acquired from Somis. Somis' obligation to Kaiser Aetna under the first and second installment notes was thereafter reduced by 25 percent to a total of $2,575,875.

The partnership agreement and certificate signed by GHL and the Somis limited partners were generally similar to those of Mai-Kai, with the following material differences:

(1) The initial 15-year term could be extended by a 51-percent vote of limited partners.

(2) The general partner could not sell or pledge more than 45 percent of the partnership's assets or refinance the property without the approval of 51 percent of the limited partnership interests.

(3) The general partner was allowed additional compensation for organizational services, and an "incentive" fee equal to a percentage of cash flow in excess of a stated amount.

(4) Profits, proceeds from sales of assets, and liquidation proceeds were allocated, 15 percent to the general partner and 85 percent to the limited partners. The general partner had no interest in cash flow.

(5) Fifty-one percent of the limited partnership interests could elect to terminate the partnership. The same percentage could vote to remove the general partner, in which event the partnership would terminate unless 51 percent of the limited partnership interests elected to form a new partnership to continue the business. On removal, the general partner would be paid the value of its interest, as determined by arbitration.

(6) The limited partners acknowledged the general partner's receipt of a real estate broker's commission in connection with the acquisition of the real property.

(7) The rights of the parties were contingent on approval by the State department of corporations of the sale of the limited partnership interests.

(8) The agreement could be amended by a 51-percent vote of limited partners.

On two separate occasions individual limited partnership interests in Somis were transferred from the individual limited partner to a joint tenancy between the limited partner and his wife. In both instances, the individual limited partner wrote to GHL to request that such transfer be accomplished. GHL provided partnership agreements and certificates to be signed by the wives and thereafter filed amended certificates of limited partnership reflecting the transfer of ownership from sole ownership to joint tenancy without invoking any restrictions with respect to transferability.

In the case of Somis, GHL had a 15-percent "subordinated" participation interest in operating profits and net proceeds upon the sale of partnership assets. GHL did not have a participation interest in Somis' cash flow. The amount by which GHL's participation interest in the net profit was subordinated—i.e., the amount remaining in the limited partners' investment accounts (which amount was to be recovered by the limited partners before GHL was entitled to participate)—was as follows:

| End of year | Subordinated amount (including 6-percent interest) |
|---|---|
| 1969 | $271,992 |
| 1970 | 252,714 |
| 1971 | 277,074 |
| 1972 | 281,232 |
| 1973 | 300,342 |

During the taxable years 1969 to 1973 inclusive, Somis operated at a loss. The following schedule sets forth the annual losses as reported by Somis on its U.S. Partnership Income Tax Returns:

| Year | Loss |
|---|---|
| 1969 | $185,820 |
| 1970 | 595,853 |
| 1971 | 373,220 |
| 1972 | 267,335 |
| 1973 | 229,621 |

On their respective individual and corporate U.S. income tax returns, the petitioners deducted their distributive shares of the

losses reported by Somis. Respondent disallowed said deductions on the ground that Somis was an association taxable as a corporation within the meaning of section 7701(a)(3).

For its taxable years ending March 31, GHL reported gross receipts on its Federal income tax returns of the types and in the amounts shown below:

| | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|---|
| Gross receipts | $109,692.11 | $342,145.02 | $287,051.78 | $65,839.04 | $58,580.07 | $37,961.00 |
| Interest | -- | 1,477.96 | 3,082.86 | 965.81 | -- | -- |
| Partnership participation | -- | -- | 118.00 | -- | -- | -- |
| Other | -- | -- | -- | -- | 17.24 | -- |
| Total | 109,692.11 | 343,622.98 | 290,252.64 | 66,804.85 | 58,597.31 | 37,961.00 |

GHL received $118 in 1971 as a distribution of cash flow from a limited partnership known as El Camino. An additional $1,470 was distributed by El Camino as the general partner's share of cash flow, but pursuant to agreement was paid to an entity related to GHL. From 1971 to 1973 the general partner's share of cash flow in El Camino amounted to $3,190.60, of which all but the above amounts was inadvertently distributed to the limited partners.

No limited partner in Somis or Mai-Kai was a stockholder of GHL, with the exception of Harris E. Lawless, who at all pertinent times held a 1.905-percent limited partnership interest in Somis and owned 23.125 percent of the stock of GHL. Neither Somis nor Mai-Kai issued certificates to the limited partners representing shares in the partnerships. During the period 1968 to 1973, no meetings of the limited partners in Mai-Kai were held, nor were any decisions with respect to either Mai-Kai or Somis referred to the limited partners for their vote or approval. Meetings of the Somis partners were held in December of 1972 and 1973 to allow Kaiser Aetna to inform them of progress in obtaining master plan approval for the planned city development covering the land owned by Somis.

Pursuant to the provisions of the California Corporate Securities Law (Cal. Corp. Code secs. 25000 et seq.), and prior to the formation of Somis, GHL applied for and secured from the California Corporations Commissioner a permit authorizing it to offer for sale, negotiate for the sale of, and sell security interests (or subscriptions therefor) in Somis.

Offering circulars, prepared by GHL, were distributed by GHL to prospective limited partners in Somis and Mai-Kai. The circulars advertised the limited partnership interests as "tax-

sheltered real estate investments," and contained extensive descriptions of the underlying real property, the investment terms, and the anticipated return on the proposed investments.

Of the 42 limited partnership "units" sold in Somis, 17 were sold by two employees of GHL, Robert L. Horth and Alan J. Parisse, without commission. Horth and Parisse held restricted brokers' licenses issued by the National Association of Security Dealers (hereinafter NASD), which authorized them to sell mutual funds, limited partnership interests, and similar investments but not to sell stocks, bonds, or other corporate securities. Eleven and one-half of the Somis limited partnership "units" were sold by Robert Schmidt (a shareholder and director of GHL but not an employee), who was paid a commission on his sales by GHL. Schmidt also held a restricted NASD broker's license. The remaining 13½ Somis limited partnership "units" were sold by a total of nine financial planners holding restricted NASD brokers' licenses, all of whom were paid a commission by GHL.

All of the Mai-Kai limited partnership "units" were sold to investors by Robert L. Horth and Alan J. Parisse (as GHL employees) under their restricted NASD brokers' licenses. No commissions were paid to Horth or Parisse on said sales.

OPINION

Petitioners owned limited partnership interests in Mai-Kai and Somis, two real estate ventures organized under the California Uniform Limited Partnership Act, Cal. Corp. Code secs. 15501 et seq. (West Supp. 1976) (hereinafter referred to as CULPA). The partnerships incurred losses during the years in issue, and petitioners deducted their distributive shares of such losses on their individual tax returns. Respondent disallowed those deductions on the ground that the partnerships were associations taxable as corporations, as defined in section 7701(a)(3),[6] and not partnerships as defined in section 7701(a)(2).[7] Petitioners allege that the partnerships fail all of the

---

[6] That section reads as follows:
Sec. 7701(a)(3). CORPORATION.—The term "corporation" includes associations, joint-stock companies, and insurance companies.

[7] That section reads as follows:
Sec. 7701(a)(2). PARTNERSHIP AND PARTNER.—The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

tests of corporate resemblance established by respondent's regulations (sec. 301.7701-2, Proced. & Admin. Regs.); respondent contends that all those tests are satisfied. Both sides agree that the regulations apply and are controlling, and our opinion and decision are consequently framed in that context; the validity of respondent's regulations is not before us.[8] In our previous (now withdrawn) opinion dated October 21, 1975, we concluded that respondent should prevail. Upon reconsideration, we have come to the opposite conclusion and hold for petitioners.

The starting point of the regulations' definition of an "association" is the principle applied in *Morrissey v. Commissioner,* 296 U.S. 344 (1935), that the term includes entities which resemble corporations although they are not formally organized as such. *Morrissey* identified several characteristics of the corporate form which the regulations adopt as a test of corporate resemblance. For the purpose of comparing corporations with partnerships, the significant characteristics are: continuity of life; centralization of management; limited liability; and free transferability of interests. Other corporate or noncorporate characteristics may also be considered if appropriate in a particular case. An organization will be taxed as a corporation if, taking all relevant characteristics into account, it more nearly resembles a corporation than some other entity. Sec. 301.7701-2(a)(1), Proced. & Admin. Regs.; see and compare *Bush #1,* 48 T.C. 218, 227-228 (1967), and *Giant Auto Parts, Ltd.,* 13 T.C. 307 (1949). This will be true only if it possesses more corporate than noncorporate characteristics.

The regulations discuss each major corporate characteristic separately, and each apparently bears equal weight in the final balancing. See pp. 185-186 *infra.* This apparently mechanical approach may perhaps be explained as an attempt to impart a degree of certainty to a subject otherwise fraught with imponderables. In most instances, the regulations also make separate provision for the classification of limited partnerships. Petitioners rely heavily on those provisions, while respondent seeks to distinguish them or to minimize their importance.

---

[8] In this connection, we note the following passage from the Supreme Court opinion in *Morrissey v. Commissioner,* 296 U.S. 344, 354-355 (1935):

"As the statute merely provided that the term 'corporation' should include 'associations,' without further definition, the Treasury Department was authorized to supply rules for the enforcement of the Act within the permissible bounds of administrative construction. Nor can this authority be deemed to be so restricted that the regulations, once issued, could not later be clarified or enlarged so as to meet administrative exigencies or conform to judicial decision."

## 1. *Continuity of Life*

Pertinent provisions of the regulation concerning this characteristic are set forth below.[9] A corporation possesses a greater degree of continuity of life than a partnership, since its existence is not dependent upon events personally affecting its separate members. Because of their more intimate legal and financial ties, partners are given a continuing right to choose their associates which is denied to corporate shareholders. A material alteration in the makeup of the partnership, as through the death or incapacity of a partner, either dissolves the partnership relation by operation of law or permits dissolution by order of court. Uniform Partnership Act, secs. 31 and 32 (hereinafter referred to as UPA). Partners are then free to withdraw their shares from the business, though they may agree to form a new partnership to continue it. A partner is also given the right to dissolve the partnership and withdraw his capital (either specific property or the value of his interest) at will at any time (UPA sec. 31(2)), although he may be unable to cause the winding up of the business and may be answerable in damages to other partners if his act breaches an agreement among them (UPA secs. 37 and 38(2)). The significant difference between a corporation and a partnership as regards continuity of life, then,

---

[9] Sec. 301.7701-2(b), Proced. & Admin. Regs., provides:

(b) *Continuity of life.* (1) * * * if the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will cause a dissolution of the organization, continuity of life does not exist. If the retirement, death, or insanity of a general partner of a limited partnership causes a dissolution of the partnership, unless the remaining general partners agree to continue the partnership or unless all remaining members agree to continue the partnership, continuity of life does not exist. See *Glensder Textile Company* (1942) 46 B.T.A. 176 (A., C.B. 1942-1, 8).

(2) For purposes of this paragraph, dissolution of an organization means an alteration of the identity of an organization by reason of a change in the relationship between its members as determined under local law. * * * An agreement by which an organization is established may provide that the business will be continued by the remaining members in the event of the death or withdrawal of any member, but such agreement does not establish continuity of life if under local law the death or withdrawal of any member causes a dissolution of the organization. Thus, there may be dissolution of the organization and no continuity of life although the business is continued by the remaining members.

(3) An agreement establishing an organization may provide that the organization is to continue for a stated period or until the completion of a stated undertaking or such agreement may provide for the termination of the organization at will or otherwise. In determining whether any member has the power of dissolution, it will be necessary to examine the agreement and to ascertain the effect of such agreement under local law. * * * if, notwithstanding such agreement, any member has the power under local law to dissolve the organization, the organization lacks continuity of life. Accordingly, a general partnership subject to a statute corresponding to the Uniform Partnership Act and a limited partnership subject to a statute corresponding to the Uniform Limited Partnership Act both lack continuity of life.

is that a partner can always opt out of continued participation in and exposure to the risks of the enterprise. A corporate shareholder's investment is locked in unless liquidation is voted or he can find a purchaser to buy him out.

In a partnership subject to the Uniform Limited Partnership Act (hereinafter referred to as ULPA), this right of withdrawal is modified. A limited partner can withdraw his interest on dissolution (ULPA sec. 16), but he can neither dissolve the partnership at will (ULPA sec. 10) nor force dissolution at the retirement, death, or insanity of a general partner if the remaining general partners agree to continue the business in accordance with a right granted in the partnership certificate (ULPA sec. 20). CULPA section 15520 [10] further provides that a new general partner can be elected to continue the business without causing dissolution, if the certificate permits.

The sole general partner in the limited partnerships involved herein was a corporation, whose business was the promotion and management of real estate ventures. As a practical matter, it is unlikely that either Mai-Kai or Somis would have been dissolved midstream and the partners afforded an opportunity to withdraw their investments. Petitioners argue that the partnerships nevertheless lacked continuity of life because they could be dissolved either at will by, or on the bankruptcy of, the general partner. We turn first to the effect of bankruptcy of GHL.

California Uniform Partnership Act section 15031(5) (West Supp. 1976) (hereinafter referred to as CUPA) provides that a partnership is dissolved on the bankruptcy of a partner. CUPA section 15006(2) makes that act applicable to limited partnerships unless inconsistent with statutes relating to them. CULPA nowhere provides for dissolution or nondissolution in the event of bankruptcy. Section 15520, which merely covers dissolution and countervailing action by the remaining partners under certain circumstances, does not provide for such event. See n. 10 *supra*. CUPA section 15031(5) therefore applies. Since the bankruptcy of GHL would bring about dissolution by operation of law, each limited partner would be entitled to demand the return

---

[10] That section provided during the years in issue:

The retirement, death, insanity, removal or failure of reelection of a general partner dissolves the partnership, unless the business is continued by the remaining general partners and/or the general partner or general partners elected in place thereof

(a) Under a right so to do stated in the certificate, or

(b) With the consent of all members * * * [Cal. Stats. 1963, c. 870, sec. 5 at 2112.]

of his contribution (CULPA sec. 15516). Somis and Mai-Kai simply do not satisfy the regulations' test of continuity, which requires that the "bankruptcy * * * of *any member* will *not* cause a dissolution of the organization." (Emphasis supplied.) [11]

The fact that under the agreements involved herein a new general partner might be chosen to continue the business does not affect this conclusion. Respondent seizes upon this aspect of the agreements to argue that the limited partners *could anticipate* the bankruptcy of GHL [12] and elect a new general partner. But this element does not detract from the hard fact that if GHL became bankrupt while it was the general partner of Somis and Mai-Kai, there would at best be a hiatus between the event of bankruptcy and the entry of a new general partner so that, from a legal point of view, the old partnerships would have been dissolved. Moreover, at least in the case of Mai-Kai, a vote of 100 percent of the limited partners was required to elect a new general partner. *Glensder Textile Co.,* 46 B.T.A. 176 (1942), held that such contingent continuity of life did not resemble that of a corporation. Respondent's regulations (see n 9 *supra*) incorporate this conclusion.

We hold that the partnerships involved herein do not satisfy the "continuity of life" test as set forth in respondent's regulations. We recognize that our application of respondent's existing regulations to the event of bankruptcy results in a situation where it is unlikely that a limited partnership will ever satisfy the "continuity of life" requirement of those regulations. But the fact that the regulations are so clearly keyed to "dissolution" (a term encompassing the legal relationships between the partners) rather than "termination of the business" (a phrase capable of more pragmatic interpretation encompassing the life of the business enterprise) leaves us with no viable alternative. [13] In this connection, we note that respondent is not

---

[11] In light of our conclusion, *infra* at pp. 177-179, that GHL has not been shown to have had a substantial interest in the partnerships, it may be argued that it was not a "member" for the purpose of the regulations. Such an argument, however, we find to be structurally incompatible with the regulations, which consider the substantiality of a partner's interest in the partnership only in connection with centralization of management and transferability of interests. Cf. sec. 301.7701-2(d)(2), Proced. & Admin. Regs., n. 19 *infra* (fourth sentence).

[12] An assumption which, given the startling instances of unexpected bankruptcies in the current business world and the absence of involvement of the limited partners in the operations of GHL, is questionable.

[13] It should be noted that under sec. 5(i) of the Bankruptcy Act, 11 U.S.C. sec. 23(i) (1970), bankruptcy of all general partners requires that the partnership itself be

without power to alter the impact of our application of his existing regulations. See *Morrissey v. Commissioner*, n. 8 *supra.*

In view of our conclusion as to the effect of GHL's bankruptcy, we find it unnnecessary to deal with the contentions of the parties as to whether, under California law, GHL had the legal power to dissolve both Mai-Kai and Somis so as to counteract the "continuity of life" elements contained in the rights of the limited partners under the partnership agreements and certificates, or whether, in respect of this characteristic, CULPA corresponded to the Uniform Limited Partnership Act. See sec. 301.7701-2(b)(2) and (3), Proced. & Admin. Regs., n. 9, *supra.* Indeed, since the California law, as we interpret it, does not permit the partners in Mai-Kai and Somis to contract against dissolution in the event of bankruptcy of GHL, the rights and duties created by the agreements and certificates cannot alter our conclusion on the "continuity of life" issue; this is a quite different situation from that which exists when other corporate characteristics such as centralized management (see pp. 178-179 *infra*) and free transferability of interest (see pp. 182-184 *infra*) are considered.

## 2. *Centralized Management*

In the corporate form, management is centralized in the officers and directors; the involvement of shareholders as such in ordinary operations is limited to choosing these representatives. In a general partnership, authority is decentralized and any partner has the power to make binding decisions in the ordinary course (UPA sec. 9). In a limited partnership, however, this authority exists only in the general partners (ULPA secs. 9 and 10), and a limited partner who takes part in the control of the business loses his limited liability status (ULPA sec. 7). From a practical standpoint, it is clear that the management of both Mai-Kai and Somis was centralized in GHL. The sole general partner was empowered by law as well as by the partnership agreements to administer the partnership affairs. However, respondent's regulations specify that—

In addition, limited partnerships subject to a statute corresponding to the Uniform Limited Partnership Act, generally do not have centralized management, but centralized management ordinarily does exist in such a

adjudicated bankrupt.

limited partnership if substantially all the interests in the partnership are owned by the limited partners. [Sec. 301.7701-2(c)(4), Proced. & Admin. Regs.]

In other words, even though there may be centralized administration by a general partner, the "centralization of management" test will not be met if the general partner has a meaningful proprietary interest. See *Zuckman v. United States,* 524 F.2d 729 (Ct. Cl. 1975). In specifying this additional condition, respondent has adopted the theory of *Glensder Textile Co., supra,* that managing partners with such interests in the business are not "analogous to directors of a corporation" because they act in their own interests "and not *merely* in a representative capacity for a body of persons having a limited investment and a limited liability." (46 B.T.A. at 185; emphasis added.) It is thus necessary to look to the proprietary interest of GHL in order to determine whether the additional condition imposed by respondent's regulations has been met.[14]

Unlike the taxpayers in *Zuckman v. United States, supra,* petitioners herein have failed to show that the limited partners did not own all or substantially all the interests in the partnerships involved herein within the meaning of the regulations. GHL's interests in Mai-Kai and Somis were subordinated to those of the limited partners. Petitioners have not attempted to demonstrate that GHL's capital interests had any present value during the years in issue, and it is clear that, because of the subordination provisions, it had no present right to income during those years. Petitioners would have us look to the anticipated return on the partnership properties in future years to determine that GHL had a substantial proprietary stake in the business independent of its management role. They have not, however, proved by competent evidence that such a return could in fact be expected, relying instead on unsupported projections; [15] nor have they shown that any such future profit would be reflected in the present value of GHL's interest. Although there was testimony that GHL expected profits from the subordinated interests when the limited partnerships were liquidated, we are not convinced that the possibility of such income at an indefinite

---

[14] We need not determine what the consequences would be if the respondent's regulations did not contain this additional condition. Cf. *John Provence #1 Well,* 37 T.C. 376 (1961), affd. 321 F. 2d 840 (3d Cir. 1963).

[15] For example, petitioners blithely assume a 3-percent annual increase in the value of the real estate, which they characterize as "conservative," and, in effect, ask us to take judicial notice that their assumption is valid.

future date had value during the years at issue. GHL reported gross income of $906,930.89 from fiscal 1969 to fiscal 1974, out of which only $118 represented a partnership distribution (from a partnership not involved herein).[16]

Furthermore, the limited partners in Somis and Mai-Kai possessed the right to remove GHL as the general partner. Thus, GHL's right to participate in future growth and profits was wholly contingent on satisfactory performance of its management role,[17] and not at all analogous to the independent proprietary interest of a typical general partner. In *Glensder Textile Co., supra,* our conclusion that centralization of management was lacking rested not only on the fact that management retained a proprietary interest but also on the fact that the limited partners could not "remove the general partners and control them as agents, as stockholders may control directors." 46 B.T.A. at 185.

Petitioners argue that such power of removal and control could be given to limited partners under ULPA,[18] that CULPA (which makes specific reference to such power) is a statute corresponding to ULPA, and that accordingly respondent's regulation requires a decision in their favor on this issue. In our opinion, the regulation was not intended to provide a blanket exemption from association status for ULPA limited partnerships, regardless of the extent to which the partners by agreement deviate from the statutory scheme. It states only that a limited partnership in an ULPA jurisdiction *generally* will lack centralized management. See p. 176 *supra.* We have repeatedly held that an organization is to be classified by reference to the rights and duties created by agreement as well as those existing under State law. *Bush #1,* 48 T.C. at 228; *Western Construction Co.,* 14 T.C. 453, 467 (1950),

---

[16] The parties have stipulated that $1,588 was distributed as GHL's share of cash flow but that all but $118 was distributed directly to a related entity. It is also stipulated that an additional $1,602.60 should have been distributed to GHL but was inadvertently distributed to the limited partners.

[17] On removal, GHL would have been entitled to receive the cash value of its interest, both by statute (CUPA sec. 15038(1)) and, in the case of Somis, by agreement. To the extent of that value, GHL would have a vested present proprietary interest to protect. The petitioners had the burden of showing that such value existed and that it was substantial; they have done neither. GHL did not list any partnership interests as assets on its tax returns and apparently did not report any income either on the receipt of a partnership interest or on the lapse of a subordination clause. See secs. 1.61-2(d)(5) and 1.421-6(d)(2), Income Tax Regs.; *Sol Diamond,* 56 T.C. 530 (1971), affd. 492 F.2d 286 (7th Cir. 1974). Cf. sec. 83. It did, however, report as ordinary income $118 of cash flow received from another partnership. See n. 16 *supra.*

[18] Cf. UPA sec. 31.

affd. per curiam 191 F. 2d 401 (9th Cir. 1951); *Glensder Textile Co.,* 46 B.T.A. at 183. The effect of such organic laws as ULPA (and CULPA) is to provide a rule which governs in the absence of contrary agreement. Where the theme is obscured by the variations, it is the latter which set the tone of the composition. Neither ULPA nor CULPA requires that the limited partners be given the right to remove the general partner; in fact, ULPA *does* not even mention such a possibility. By reserving that right, the limited partners in Mai-Kai and Somis took themselves out of the basic framework of ULPA and hence out of the shelter of the regulation, which is based on *Glensder.*

We conclude that Somis and Mai-Kai had centralized management within the meaning of respondent's regulations.

### 3. *Limited Liability*

Unless some member is personally liable for debts of, and claims against, an entity, section 301.7701-2(d)(1), Proced. & Admin. Regs., states that the entity possesses the corporate characteristic of limited liability. The regulation provides that "in the case of a limited partnership subject to a statute corresponding to the Uniform Limited Partnership Act, personal liability exists with respect to each general partner, except as provided in subparagraph (2) of this paragraph." The first sentence of subparagraph (2)[19] establishes a conjunctive test,

---

[19] The full text of sec. 301.7701-2(d), Proced. & Admin. Regs., is as follows:

(d) *Limited liability.* (1) An organization has the corporate characteristic of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization. Personal liability means that a creditor of an organization may seek personal satisfaction from a member of the organization to the extent that the assets of such organization are insufficient to satisfy the creditor's claim. A member of the organization who is personally liable for the obligations of the organization may make an agreement under which another person, whether or not a member of the organization, assumes such liability or agrees to indemnify such member for any such liability. However, if under local law the member remains liable to such creditors notwithstanding such agreement, there exists personal liability with respect to such member. In the case of a general partnership subject to a statute corresponding to the Uniform Partnership Act, personal liability exists with respect to each general partner. Similarly, in the case of a limited partnership subject to a statute corresponding to the Uniform Limited Partnership Act, personal liability exists with respect to each general partner, except as provided in subparagraph (2) of this paragraph.

(2) In the case of an organization formed as a limited partnership, personal liability does not exist, for purposes of this paragraph, with respect to a general partner when he has no substantial assets (other than his interest in the partnership) which could be reached by a creditor of the organization and when he is merely a "dummy" acting as the agent of the limited partners. Notwithstanding the formation of the organization as a limited partnership, when the limited partners act as the principals of such general partner, personal liability will exist with respect to such limited partners. Also, if a corporation is a

under which a general partner is considered not to have personal liability only "when he has no substantial assets (other than his interest in the partnership) which could be reached by a creditor of the organization *and* when he is merely a 'dummy' acting as the agent of the limited partners." (Emphasis added.) In other words, personal liability exists if the general partner *either* has substantial assets *or* is not a dummy for the limited partners. We do not agree with respondent's assertion, made for the first time in connection with the motion for reconsideration, that the regulation should be read disjunctively. Although the purpose of subparagraph (2) was ostensibly to delineate the conditions under which personal liability of a general partner *does not exist,* practically all the remaining material in the subparagraph outlines the conditions under which such personal liability does exist. In several examples, personal liability is said to exist, either because the general partner has substantial assets or because he is not a dummy  for the limited partners. See *Zuckman v. United States, supra.* In no instance is there a suggestion that both conditions established by the first sentence of subparagraph (2) need not be satisfied.

In so concluding, we are mindful that in *Glensder Textile Co., supra,* the apparent source of the language in the regulations, the term "dummy" was arguably considered applicable to any general partner without substantial assets risked in the business. The opinion in *Glensder* states (46 B.T.A. at 183):

If, for instance, the general partners were not men with substantial assets risked in the business *but* were mere dummies without real means acting as the agents of the limited partners, whose investments made possible the business, there would be something approaching the corporate form of stockholders and directors. * * * [Emphasis added.]

general partner, personal liability exists with respect to such general partner when the corporation has substantial assets (other than its interests in the partnership) which could be reached by a creditor of the limited partnership. A general partner may contribute his services, but no capital, to the organization, but if such general partner has substantial assets (other than his interest in the partnership), there exists personal liability. Furthermore, if the organization is engaged in financial transactions which involve large sums of money, and if the general partners have substantial assets (other than their interests in the partnership), there exists personal liability although the assets of such general partners would be insufficient to satisfy any substantial portion of the obligations of the organization. In addition, although the general partner has no substantial assets (other than his interest in the partnership), personal liability exists with respect to such general partner when he is not merely a "dummy" acting as the agent of the limited partners.

Thus, lack of substantial assets seems to be considered the equivalent of being a dummy—an equivalence which respondent apparently sought to avoid by using the word "and" in his existing regulations.[20]

While it may be doubtful that GHL could be considered to have had substantial assets during the years in issue, we find it unnecessary to resolve this question since it is clear that GHL was not a dummy for the limited partners of Somis and Mai-Kai. Respondent contends that GHL fell within the "dummy" concept because it was subject to removal by the limited partners, and thus was subject to their ultimate control. While it is true that a mere "dummy" would be totally under the control of the limited partners, it does not follow that the presence of some control by virtue of the power to remove necessarily makes the general partner a "dummy." It seems clear that the limited partners' rights to remove the general partner were designed to give the limited partners a measure of control over their investment without involving them in the "control of the business"; the rights were not designed to render GHL a mere dummy or to empower the limited partners "to direct the business actively through the general partners." *Glensder Textile Co.,* 46 B.T.A. at 183. Moreover, the record indicates that the limited partners did not use GHL as a screen to conceal their own active involvement in the conduct of the business; far from being a rubber stamp, GHL was the moving force in these enterprises. With a minor

---

[20] In this connection, it is of interest to note that the proposed regulations were cast solely in economic terms, i.e., relied entirely on substantiality of assets, without any reference whatsoever to a "dummy" situation. See 24 Fed. Reg. 10,450, 10,452 (1959), which reads as follows:

(d) *Limited liability.* (1) An organization has the corporate characteristic of limited liability if there is no member who is personally liable for the debts of or the claims against the organization. Personal liability means that a creditor of an organization may seek personal satisfaction from a member of the organization to the extent that the assets of such organization are insufficient to satisfy the creditor's claim.

(2) For purposes of this paragraph, personal liability does not exist when the only members who are personally liable for the debts of the organization have no substantial assets which could be reached by a creditor of the organization. A member may contribute his services, but no capital, to the organization, but if such member is personally liable for the debts of the organization and has substantial assets, there exists personal liability. Furthermore, if the organization is engaged in financial transactions which involve large sums of money, and if the members who are personally liable have substantial assets, there exists personal liability although the assets of such members would be insufficient to satisfy any substantial portion of the obligations of the organization. However, personal liability does not exist when the members who are personally liable have risked no substantial assets.

exception, the persons controlling GHL were independent of and unrelated to the limited partners.

In view of the foregoing, we conclude that personal liability existed with respect to GHL, and the partnerships lack the corporate characteristic of limited liability.

### 4. *Transferability of Interests*

A stockholder's rights and interest in a corporate venture are, absent consensual restrictions, freely transferable by the owner without reference to the wishes of other members. A partner, on the other hand, can unilaterally transfer only his interest in partnership "profits and surplus," and cannot confer on the assignee the other attributes of membership without the consent of all partners (UPA secs. 18(g), 26, and 27). Respondent's regulations recognize and rely upon this distinction.[21]

The regulations state that if substantially all interests are freely transferable, the corporate characteristic of free transferability of interests is present. Since we have concluded, for the purposes of this case, that the limited partners should be considered as owning substantially all the interests in Mai-Kai and Somis (see pp. 177-179 *supra*), we turn our attention to the question whether their interests were so transferable.

A transferee of a limited partnership interest may become a substituted limited partner with the consent of all members or under a right given in the certificate. CULPA sec. 15519. The

---

[21] Sec. 301.7701-2(e), Proced. & Admin. Regs., provides:

(e) *Free transferability of interests.* (1) An organization has the corporate characteristic of free transferability of interests if each of its members or those members owning substantially all of the interests in the organization have the power, without the consent of other members, to substitute for themselves in the same organization a person who is not a member of the organization. In order for this power of substitution to exist in the corporate sense, the member must be able, without the consent of other members, to confer upon his substitute all the attributes of his interest in the organization. Thus, the characteristic of free transferability of interests does not exist in a case in which each member can, without the consent of other members, assign only his right to share in profits but cannot so assign his rights to participate in the management of the organization. Furthermore, although the agreement provides for the transfer of a member's interest, there is no power of substitution and no free transferability of interest if under local law a transfer of a member's interest results in the dissolution of the old organization and the formation of a new organization.

(2) If each member of an organization can transfer his interest to a person who is not a member of the organization only after having offered such interest to the other members at its fair market value, it will be recognized that a modified form of free transferability of interests exists. In determining the classification of an organization, the presence of this modified corporate characteristic will be accorded less significance than if such characteristic were present in an unmodified form.

partnership certificates of Mai-Kai and Somis are silent in this regard. However, when the provisions of the agreements relating to transferability and the power of an assignee to obtain a judicial amendment of the partnership certificate (see CULPA secs. 15502(1)(a)X and 15525) are taken into account, it would appear that the agreements rather than the certificates should be considered the controlling documents herein. Indeed, petitioners do not seek to draw any solace from the certificates, positing their arguments as to lack of transferability on the agreements themselves.

Both partnership agreements permit the assignment of a limited partner's income interest with the consent of the general partner, which may not unreasonably be withheld. Petitioners have not suggested any ground on which consent could be withheld. The requirement of consent, circumscribed by a standard of reasonableness, is not such a restriction on transfer as is typical of partnership agreements; nor is it the sort referred to by the regulations. In our opinion, the limited partners' income rights were freely transferable. See *Outlaw v. United States,* 494 F. 2d 1376, 1384 (Ct. Cl. 1974).

Petitioners also argue that transferability is limited by the requirement that, in the event of a proposed assignment, a limited partner's capital interest first be offered to other members under certain circumstances. While an assignment for less than fair market value could be prevented in this manner, there was no requirement that such an offer be made if an interest was to be sold to a third party at fair market value. Thus, there was no "effort on the part of the parties to select their business associates," as is characteristic of the usual partnership arrangement. *J. A. Riggs Tractor Co.,* 6 T.C. 889, 898 (1946). We think that these interests possessed considerably more than the "modified" form of free transferability referred to in subparagraph (2) of the regulation.

In sum, an assignee for fair consideration of a limited partner's interest in Somis or Mai-Kai could acquire all of the rights of a substituted limited partner within the framework of the agreement and governing State law, without discretionary consent of any other member. Any restrictions or conditions on such a transfer were procedural rather than substantive. The right of assignment more closely resembles that attending corporate shares than that typically associated with partnership interests.

Mai-Kai and Somis therefore possessed the corporate characteristic of free transferability of interests. See also n. 23 *infra.*

### 5. *Other Characteristics*

Both parties have identified other characteristics of Mai-Kai and Somis which they allege are relevant to the determination whether those entities more closely resemble partnerships or corporations. Some of these are within the ambit of the major characteristics already discussed. Petitioners point to the fact that, unlike a corporate board of directors, GHL as manager lacked the discretionary right to retain or distribute profits according to the needs of the business. This argument is in reality directed to the issue of centralized management. The same is true of respondent's analogy between the limited partners' voting rights and those of corporate shareholders. To be sure the partnership interests were not represented by certificates but this factor conceivably is more properly subsumed in the transferability issue. See *Morrissey v. Commissioner,* 296 U.S. at 360. Moreover, those interests were divided into units or shares and were promoted and marketed in a manner similar to corporate securities—an additional "characteristic" which we have not ignored, (see *Outlaw v. United States, supra),* but which we do not deem of critical significance under the circumstances herein. Similarly, we do not assign any particular additional importance to the facts that the partnerships have not observed corporate formalities and procedures (*Morrissey v. Commissioner, supra; Giant Auto Parts, Ltd.,* 13 T.C. 307 (1949)) or that, unlike general partners, limited partners were not required personally to sign the partnership certificates. Finally, respondent argues that the limited partnerships resemble corporations because they provide a means of pooling investments while limiting the liability of the participants. Cf. *Helvering v. Combs,* 296 U.S. 365 (1935). As it relates to the facts of this case, this point is subsumed in our earlier discussion. To the extent that it presages an attempt to classify *all* limited partnerships as corporations, it is in irreconcilable conflict with respondent's own regulations.

## 6. *Conclusion*

The regulations provide that an entity will be taxed as a corporation if it more closely resembles a corporation than any other form of organization. They further state that such a resemblance does not exist unless the entity possesses *more* corporate than noncorporate characteristics. If every characteristic bears equal weight, then Mai-Kai and Somis are partnerships for tax purposes. We have found that they possess only two of the four major corporate characteristics and that none of the other characteristics cited by the parties upsets the balance.[22] On the other hand, if the overall corporate resemblance test, espoused by *Morrissey* and adhered to by the regulations, permits us to weigh each factor according to the degree of corporate similarity it provides, we would be inclined to find that these entities were taxable as corporations. Each possessed a degree of centralized management indistinguishable from that of a pure corporation; the other major factors lie somewhere on the continuum between corporate and partnership resemblance. Were not the regulations' thumb upon the scales, it appears to us that the practical continuity and limited liability of both entities would decisively tip the balance in respondent's favor. However, we can find no warrant for such refined balancing in the regulations or in cases which have considered them. See *Zuckman v. United States,* 524 F.2d 729 (Ct. Cl. 1975); *Outlaw v. United States, supra; Kurzner v. United States,* 413 F. 2d 97, 105 (5th Cir. 1969) ("four equally weighted procrustean criteria"); secs. 301.7701-2(a)(3) and 301.7701-3(b)(2), Proced. & Admin. Regs., example (2). Cf. *Estate of Smith v. Commissioner,* 313 F. 2d 724, 736 (8th Cir. 1963) ("substantially greater noncorporate characteristics both in number *and in importance*") (emphasis added). Only in connection with free transferability of interests do the regulations recognize a modified and less significant form of a particular characteristic.[23]

Our task herein is to apply the provisions of respondent's regulations as we find them and not as we think they might or

---

[22] Indeed, considering the importance of predictability in applying respondent's regulations, we would not be inclined to give such lesser characteristics controlling weight unless their materiality was unmistakable, a situation which does not obtain in this case.

[23] Even if we had found that the interests of the limited partners in Somis and Mai-Kai possessed only such modified form of free transferability, petitioners would still prevail, since the balance would be two characteristics favoring partnership status and something less than two characteristics favoring corporate status.

ought to have been written.[24] See and compare *David F. Bolger,* 59 T.C. 760, 771 (1973). On this basis, petitioners must prevail.

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

FAY and HALL, *JJ.,* did not participate in the consideration and disposition of this case.

DAWSON, *C.J.,* concurring: I agree with the result reached by the majority and with Judge Tannenwald's conclusions and reasoning with respect to each of the four basic tests of corporate characteristics set forth in the regulations. But I find it necessary to express the reasons for my disagreement with the dissenting views of Judge Quealy and Judge Simpson.

At the outset, let me say that, despite the weaknesses in the *Kintner* regulations which a difficult situation like this has highlighted, I think these cases must be decided within the framework of the four basic tests which the existing regulations specifically prescribe. Over the years since the original adoption of the *Kintner* regulations, the four basic tests created therein have become the established rules through which the Commissioner on the one hand and tax planners on the other have been able to operate with some degree of certainty in determining the tax treatment of limited partnerships. Even more important, however, is the fact that in these cases neither of the parties has challenged the validity or applicability of those regulations. Instead, the litigants have agreed that these cases must be decided within the rules of such regulations.

The *Kintner* regulations were adopted by the Treasury in 1960 in response to a need for clarification of the tax treatment of various noncorporate entities which possessed certain corporate characteristics. For a number of years the Treasury had been concerned with the attempts of various noncorporate entities, such as professional partnerships, to qualify as corporations for tax purposes in order to obtain certain tax benefits only available to corporations. In the key case of *United States v. Kintner,* 216 F. 2d 418 (9th Cir. 1954), the court held against the Government on this issue. In response to the *Kintner* decision, the Treasury revised the then-existing regulations governing the tax status of

---

[24] As to respondent's future possibilities, see *Morrissey v. Commissioner,* n. 8 *supra.*

noncorporate entities, and in 1960 promulgated the present regulations containing specific detailed tests of corporate tax status. T.D. 6503, 1960-2 C.B. 409. Thus, these regulations became known as the *"Kintner* regulations."

In the light of this background, I think the current regulations were drafted with an objective of *limiting* the ability of a partnership or other entity to qualify as a corporation for tax purposes. In fact, it might even be said that the *regulations are* weighted *against* qualification for corporate status. This is borne out by the fact that in order to qualify as a corporation, the entity must possess more corporate than noncorporate characteristics. Sec. 301.7701-2(a)(3), Proced. & Admin. Regs. Thus, if the application of the four key tests of the *Kintner* regulations results in an even split, with two tests indicating corporate status and two indicating noncorporate status, the result will be that the entity will *not* qualify as a corporation. Moreover, with respect to limited partnerships, the regulations go to some length to establish that the ordinary limited partnership (i.e., one which is "subject to a statute corresponding to the Uniform Limited Partnership Act") does not meet most of the tests of corporate status. Secs. 301.7701-2(b)(3), 301.7701-2(c)(4), and 301.7701-2(d)(1), Proced. & Admin. Regs. At the time that the *Kintner* regulations were first promulgated, and for several years thereafter, it was believed by commentators and practitioners that there was no danger that an entity established as an investment vehicle in the form of a limited partnership would be deemed an association taxable as a corporation.[1]

I would agree with Judge Quealy's observation that the existing regulations virtually rule out the possibility that an ULPA partnership will be a taxable association within the meaning of section 7701(a)(3). But he would deal with this situation by holding the *Kintner* regulations invalid. To me this approach seems inappropriate. While it is clear that taxpayers and courts should not be bound by regulations which exceed the governing statute,[2] I believe that, as a matter of equitable policy,

---

[1] See, e.g., Roberts & Alpert, "New Regulations Provide Workable Rules for Real Estate Limited Partnerships," 14 J.Tax. 230 (1961); Rustigan, "Effect of Regulation Definition on Real Estate Syndicates," Proc. N.Y.U. 19th Ann. Inst. on Fed. Taxation 1065, 1077 (1961).

[2] See, e.g., *United States v. Empey,* 406 F. 2d 157 (10 Cir. 1969), in which a portion of the *Kintner* regulations requiring partnership taxation of a professional service corporation was held invalid as inconsistent with statutory and case law.

the Government as the promulgator of such regulations should be bound by them or should take steps to change them. Moreover, it seems especially inappropriate for a court to ignore the existing regulations in cases in which both sides agree to their applicability and which are litigated thereunder.

Judge Simpson would hold for the respondent under the existing regulations. Although he agrees with the majority in the results of the application of three of the basic tests of continuity of life, centralization of management, and transferability of interests, he would tip the scales toward corporate status based upon certain additional factors which he considers material.

However, none of these so-called additional factors seems persuasive to me because either the factor referred to is common to both corporate and noncorporate entities or the factor referred to is closely related to one of the four major characteristics expressly dealt with in the regulations. Accordingly, each additional factor has no independent standing as a significant characteristic. For example, Judge Simpson refers to the rights of the limited partners to vote on the sale of all or substantially all of the assets of the partnership and to remove and replace the general partner as corporate characteristics. Certainly the right to vote on the sale of all of the assets is no more a corporate than a partnership characteristic. It is plain that in the case of a true general partnership all of the partners would have a voice in such a matter. The right to remove and replace the general partner seems to me clearly to be subsumed within the characteristic of centralized management, and Judge Simpson's viewing it as a separate corporate characteristic appears to be an unwarranted straining to tip the otherwise evenly balanced scales.

I am also concerned with the implications of resolving close cases such as these by reliance upon additional factors beyond the four specifically enumerated tests. Although the regulations do provide for consideration of such additional factors, reliance upon such factors introduces an element of subjectivity which is inconsistent with the objective standards represented by the four basic tests. Judge Simpson has focused upon several apparent corporate similarities which, taken in the aggregate, seem to give him an overall feeling that the nature of the beast is corporate. The problem with this approach is that it seriously undermines the usefulness of the objective tests which were the primary objective of the *Kintner* regulations and which now represent the estab--

lished rules for both the taxpayers and the Commissioner. Furthermore, there are limitless numbers of corporate or non-corporate characteristics of various degrees of significance to which one might point in making a case in either direction. Once we permit ourselves to operate outside the framework of the four basic objective tests, subjective determinations in either direction will inevitably be supported by a selection of several among the universe of factors supporting that view.

Another practical problem in the reliance upon additional factors is that to the extent that the presence of any such factor is significant, the *absence* of that factor should be deemed significant in the opposite direction.[3] For example, if as Judge Simpson believes, the sale of limited partnership interests as a "security" through brokers utilizing a prospectus is indicative of a corporate entity, would taxpayers in other cases then be able to argue that the *absence* of such marketing methods is indicative of a true partnership? Once we begin to deal with the materiality of negatives, the *Kintner* regulations will be reduced from the objective rules intended, to a meaningless soup sandwich.

Finally, I also disagree with Judge Simpson's analysis of the limited liability test. He is correct in observing that the interpretation which the majority (and the Court of Claims in *Zuckman*) places upon section 301.7701-2(d)(2), Proced. & Admin. Regs., renders that section virtually meaningless. That, however, is a fault of sloppy draftsmanship, resulting, I suspect, from the bias which the *Kintner* regulations reflect against classification of limited partnerships as corporations. Judge Simpson attempts to infuse rationality into this section of the regulations through an interpretation of the "dummy" clause which to me appears based upon bootstrap reasoning. He correctly points out that the term "dummy" was derived from the *Glensder Textile* case, and he quotes from the *Glensder* opinion to show that the Court there was using the term "dummy" not as meaning a straw person, but in the context of the relationship between the board of directors and the shareholders of a corporation, i.e., a representative who is answerable to the shareholders. Hence, the question of whether the general partner is a "dummy" is dependent upon whether his role is akin to that which obtains in a corporate situation. Yet the

---

[3] See Roberts & Alpert, *supra* at 235 n. 1.

determination of whether a corporate situation obtains is itself the ultimate question under the *Kintner* regulations.[4]

FEATHERSTON, IRWIN, GOFFE, and WILES, *JJ.,* agree with this concurring opinion.

GOFFE, *J.,* concurring: Our first opinion in this case was filed and served on the parties on October 21, 1975. Six judges concurred, of which I was one.

On November 5, 1975, petitioners filed a Motion for Reconsideration by the Full Court which was denied but which the Chief Judge also referred to the trial judge as a motion for reconsideration by the trial judge. The trial judge granted petitioners' motion on November 7, 1975, and on that same date the first opinion was withdrawn. Petitioners, on January 19, 1976, filed a Motion for Leave to File Supplemental Brief which was granted on January 27, 1976. All of the judges who participated have devoted considerable thought to this case both before and after the filing of the original opinion.

The opinion filed on October 21, 1975, has never been officially published by the Court; nevertheless, it created considerable interest among the members of the tax bar and accounting profession when it was filed. The length of time that the first opinion was efficacious, however, was only 17 days. It is perhaps regrettable to some that, after a more full consideration, we have changed our views. On balance, I would prefer criticism for changing my views as a result of additional thought and research than criticism for refusal to change for the sake of apparent consistency. As Justice Frankfurter so aptly put it when the Supreme Court changed its position in *Helvering v. Hallock,* 309 U.S. 106, 119 (1940), "This Court, unlike the House of Lords, has from the beginning rejected a doctrine of disability at self-correction." *Fred Sylvan,* 65 T.C. 548, 556 (1975).

FEATHERSTON and WILES, *JJ.,* agree with this concurring opinion.

---

[4] Thus, Judge Simpson is rendering the limited liability test meaningless by in effect requiring reference to the centralization of management criteria to apply the limited liability test.

RAUM, *J.,* dissenting: Much of the discussion of the problems presented by this case appears to me to be in a never-never land. The basic principles to be considered in a proper analysis of the matter in controversy were set forth in *Morrissey v. Commissioner,* 296 U.S. 344. The decisions in the field up to the time of that case had been regarded as " 'seemingly in a hopeless state of confusion,' " 296 U.S. at p. 347, and the Supreme Court granted petitions for certiorari in *Morrissey* and three other separate cases,[1] with the obvious purpose of clarifying the situation. Its opinions in all four of these cases, considering the problem in the light of four different sets of facts, laid down the basic principles which should be controlling here. And I do not understand that even a single member of this Court would hold that, measured by those principles, a result opposite to that reached by the majority would not be called for.

The decision of the majority is based upon (1) a conclusion that only two of four criteria described in the regulations support corporate classification here, and (2) the mechanical application of a supposed rigid numerical requirement that more than half of the criteria must be satisfied. It refuses to find that certain corporate characteristics, other than the four, are also present in this case; and it concludes that since, in its view, only two of the four criteria support corporate classification, neither organization here in controversy can be treated as a corporation, notwithstanding that *as a whole* each may sufficiently resemble a corporation to be so classified within the *Morrissey* doctrine. I do not think that any such simplistic, and obviously erroneous, result is required by the regulations.

As Judge Simpson's dissenting opinion points out, there is ample room within the structure of the regulations to reach a result in consonance with the principles laid down in *Morrissey.* A hospitable reading of those regulations—with a view to bringing the result within the principles of *Morrissey* upon which the regulations were based—would lead to a correct disposition of this case. As is made abundantly plain in Judge Simpson's opinion, such a reading of the regulations would make clear not only that at least three of the four criteria are satisifed here but also that "other characteristics" in addition support corporate classification. Thus, even if a mechanical numerical test were

---

[1] *Swanson v. Commissioner,* 296 U.S. 362; *Helvering v. Combs,* 296 U.S. 365; *Helvering v. Coleman-Gilbert,* 296 U.S. 369.

applied, as was done by the majority, a result compatible with *Morrissey* would be attained, without even considering the possibility that the regulations might be invalid if they required a conclusion in conflict with the controlling decision of the Supreme Court in *Morrissey,* as suggested in the dissenting opinions of Judges Drennen and Quealy. Certainly, it should not be necessary to await future clarifying modifications of the regulations before a result in conformity with the principles of a Supreme Court opinion can be reached.

DRENNEN and SIMPSON, *JJ.,* agree with this dissent.

DRENNEN, *J.,* dissenting: In my opinion the limited partnership in which petitioner was a member more nearly resembled a corporation than a.partnership under the criteria established in *Morrissey v. Commissioner,* 296 U.S. 344 (1935), and other cases, whether the characteristics are scrutinized under the regulations or without them.

Since neither party argued the invalidity of the regulations[1] and the case was presented on the basis that it would be decided under the regulations, I would reach the conclusion stated above on the reasoning of Judge Simpson in his dissenting opinion, with which I agree. However, I have considerable doubts concerning the validity of the regulations, for the reasons stated by Judge Quealy in his dissenting opinion, which I would voice under other circumstances. I doubt that the rules supplied by the Treasury Department for the application and enforcement of the law are "within the permissible bounds of administrative construction." *Morrissey v. Commissioner, supra.* See *Kurzner v. United States,* 413 F.2d 97 (5th Cir. 1969).

STERRETT, *J.,* agrees with this dissent.

---

[1] It is understandable why the case was presented in this manner. The regulations help petitioners' argument and respondent would be reluctant to argue the invalidity of the Treasury regulations. However, the validity of the regulations may properly be considered, for, as stated in *Wilkes-Barre Carriage Co.,* 39 T.C. 839, affd. 332 F.2d 421 (2d Cir. 1964), at p. 845:

"However, the rule is well established that a deficiency may be approved on the basis of reasons other than those relied on by the Commissioner or even where his reasons may be incorrect." [Citations omitted.]

SCOTT, *J.*, dissenting: I agree with the portions of Judge Simpson's dissenting opinion which are under the headings "1. *Other Significant Characteristics*" and "2. *Limited Liability.*" For these reasons, I would conclude that Mai-Kai and Somis have more corporate than partnership characteristics and, therefore, I do not agree with the contrary conclusion of the majority. In my view, having reached this conclusion, it is immaterial whether the two partnerships had continuity of life within the meaning of the regulations. However, I think it worth noting that each partnership under its agreement had a method of continuing its life until the limited partners chose to dissolve it. In my view, this characteristic of each partnership is comparable to the continuity of life characteristic of a corporation.

RAUM, *J.*, agrees with this dissent.

SIMPSON, *J.*, dissenting: The majority has presented a careful analysis of the complex matters involved in this case. However, I respectfully suggest that, while becoming involved with the intricacies of the regulations, they have lost sight of the ultimate objective of the regulations, which is to decide whether Mai-Kai and Somis more nearly resemble corporations or partnerships. For sake of emphasis, let me reiterate the matter to be decided: This case arose because the Commissioner disallowed the losses claimed by the members of those organizations. Congress has decided that such losses are deductible if, and only if, the organizations constitute partnerships for tax purposes. What we must decide is how the organizations are to be classified. Both parties have asked that we make such decision based on the present regulations so that our task is merely to interpret those regulations, and we are not asked to pass upon their validity.

### 1. *Other Significant Characteristics*

The ultimate test to be applied in classifying an organization has long been established by the courts and is set forth in the regulations as:

An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust. See *Morrissey et al. v. Commissioner* (1935) 296 U.S. 344. [Sec. 301.7701-2(a)(1), Proced. & Admin. Regs.]

In the abstract, such test gives rise to many questions, and the regulations attempt to provide definite criteria to assist in applying such test. The regulations enumerate the major characteristics of a corporation—continuity of life, centralized management, limited liability, and freely transferable interests— and set forth many rules to assist in applying those criteria. The regulations also recognize that there may be other characteristics which should be taken into consideration in the classification of an organization by providing:

In addition to the major characteristics set forth in this subparagraph, other factors may be found in some cases which may be significant in classifying an organization as an association, a partnership, or a trust. * * * [Sec. 301.7701-2(a)(1), Proced. & Admin. Regs.]

One of the rules included in the regulations is that:

(3) An unincorporated organization shall not be classified as an association unless such organization has more corporate characteristics than noncorporate characteristics. * * * For example, if a limited partnership has centralized management and free transferability of interests but lacks continuity of life and limited liability, and if the limited partnership has no other characteristics which are significant in determining its classification, such limited partnership is not classified as an association. * * * [Sec. 301.7701-2(a)(3), Proced. & Admin. Regs.]

The majority concludes that since these organizations have two major corporate characteristics—centralized management and freely transferable interests—and lack the other two major corporate characteristics, the organizations should not be classified as associations. Although they recognize that there are other corporate characteristics, they conclude that such characteristics are not helpful in the classification of the organizations.

It is that latter conclusion with which I disagree. Since under both the cases and the regulations, the ultimate test is to decide whether an organization more nearly resembles a corporation or a partnership, we must consider all characteristics which have any relevancy in making that judgment. The even-split rule of the regulations applies only when there are no other significant characteristics. Here, we do have other significant characteristics.

In *Outlaw v. United States,* 494 F. 2d 1376 (1974), cert. denied 419 U.S. 844 (1974), the Court of Claims held a trust to be taxable as an association and, in reaching that conclusion, found

two corporate characteristics to be significant even though they were not among the major corporate characteristics enumerated in the regulations. The court said:

the financing of the Trust was promoted in the beginning by the preparation and distribution of an offering memorandum or prospectus prepared by a firm of securities brokers who were paid a fee for their work, which was similar to the method used by many corporations to obtain initial capital. * * * [494 F. 2d at 1385.]

What is said in *Outlaw* regarding the method used therein to raise initial capital applies equally with respect to Mai-Kai and Somis. If anything, the method used by such organizations is even closer to that used by corporations than was the method in *Outlaw.* The interests in the limited partnerships are securities under California and Federal law, just as is corporate stock. See *Van Arsdale v. Claxton,* 391 F. Supp. 538, 540 (S.D. Cal. 1975); Comment, "SEC Regulation of California Real Estate Syndicates," 61 Cal. L. Rev. 205 (1973). Further, such interests were sold through licensed brokers just as corporate stock. GHL prepared and distributed offering circulars which advertised the interests as "tax-sheltered real estate investments." Thus, the method of raising capital and marketing the interests in the organizations was very similar, if not identical, to the methods customarily used by corporations.

The significance of such method cannot be dismissed merely because we have found that the organizations had freely transferable interests. Our conclusion that such interests were freely transferable is based on the fact that there are no significant restrictions on the transfer of such interests; it does not take into consideration the methods used for marketing such interests. Interests may be freely transferable even though they are not marketed in the same manner as corporate stock. Yet, these interests were marketed like corporate stock, and for that reason, the method of marketing constitutes a significant characteristic to be considered in classifying the organizations. See Storrer, "Limited partnership v. association: a need for change," 5 Tax Adviser 582, 589 (1974).

Moreover, Mai-Kai and Somis possess another significant characteristic which also increases their resemblance to corporations. Section 15507(b) of CULPA[1] provides that the limited partners

---

[1] Sec. 15507(b) of CULPA provides:
(b) A limited partner shall not be deemed to take part in the control of the business by

may possess and exercise voting rights with respect to any matter "affecting the basic structure" of the limited partnership. Such rights include the right of the limited partners to remove the general partner at any time and to select a replacement and the right to vote on the sale of all, or substantially all, of the assets of the partnership. The certificates of Mai-Kai and Somis provided that the limited partners in each organization had the rights to remove the general partner and to select a replacement. Such rights could not be conferred upon limited partners under ULPA. See secs. 10 and 11(4) of ULPA.

By conferring such rights on limited partners, California has created greater democracy in limited partnerships. It has thus enabled the limited partners to exercise control over the affairs of the enterprise in much the same manner as shareholders can control the affairs of a corporation. See Storrer, *supra* at 589; Livsey, "Limited Partnerships: How Far Can IRS Go in Limiting Their Use as Tax Shelters," 39 J. Tax. 123, 125 (1973). Furthermore, this characteristic is not subsumed in our determination that the organizations possess centralization of management. Centralization of management may exist in an organization formed as a limited partnership even when the limited partners do not possess rights of control over the general partner, and indeed, our conclusion in this case was reached without regard to the rights possessed by the limited partners. The rights of control stand alone and constitute another significant characteristic.

In my judgment, there is no doubt that if we take into consideration all characteristics of these organizations, Mai-Kai and Somis clearly more nearly resemble corporations than traditional partnerships. Even if we assume, as does the majority, that there is an even split among the major characteristics, the method of marketing the interests in the organizations and the control conferred upon the limited partners are surely significant characteristics, and when they are taken into consideration, they

---

virtue of his possessing or exercising a power, specified in the certificate, to vote upon matters affecting the basic structure of the partnership, including the following matters or others of a similar nature:

    (I) Election or removal of general partners.
    (II) Termination of the partnership.
    (III) Amendment of the partnership agreement.
    (IV) Sale of all or substantially all of the assets of the partnership.

establish a clear preponderance in favor of association classification.

## 2. *Limited Liability*

I also disagree with the majority's conclusion that Mai-Kai and Somis do not possess the characteristic of limited liability. The issue as to whether such organizations possess the characteristic of limited liability depends entirely on whether their sole general partner, GHL, possesses such characteristic. Whether GHL has personal or limited liability turns on the proper interpretation of section 301.7701-2(d)(2), Proced. & Admin. Regs., which provides, in part:

> (2) In the case of an organization formed as a limited partnership, personal liability does not exist, for purposes of this paragraph, with respect to a general partner when he has no substantial assets (other than his interest in the partnership) which could be reached by a creditor of the organization and when he is merely a "dummy" acting as the agent of the limited partners. * * *

I am in complete agreement with the majority that limited liability exists only when the general partner lacks substantial assets and also is "merely a 'dummy' acting as the agent of the limited partners." Here, there is no doubt that GHL lacked substantial assets; the majority recognizes that such fact may be true but finds it unnecessary to resolve this question. The majority finds that GHL was not a "dummy" since "the limited partners did not use GHL as a screen to conceal their own active involvement in the conduct of the business; far from being a rubber stamp, GHL was the moving force in these enterprises." I disagree with that construction of the term "dummy" and conclude that GHL was a "dummy" within the meaning of the regulations.

I have two reasons for my disagreement: In the first place, the majority's construction of the regulations will render the provision meaningless. In *Zuckman v. United States,* 524 F. 2d 729 (1975), the Court of Claims embraced the same construction of "dummy" now being adopted by the majority of this Court, that is, it applies only to a situation in which the general partner is merely a sham or a straw man acting for the limited partners. The Court of Claims recognized that under such construction of the regulations, a limited partnership would never possess the corporate characteristic of limited liability, because if the general partner was merely a straw man acting for the limited partners,

the limited partners would then be personally liable; on the other hand, if the general partner was not a straw man acting for the limited partners, then the general partner would be personally liable. Although the majority has not relied upon *Zuckman,* its construction of the regulations will reach the same result and make a nullity of those provisions of the regulations. The regulations surely contemplate that under some situations, an organization formed as a limited partnership may have limited liability, but the construction of the regulations adopted by the Court of Claims, and now by a majority of this Court, will result in limited partnerships never possessing such characteristic. See Livsey, "Limited Partnerships with a Sole Corporate General Partner: The Impact of *Larson* and *Zuckman,"* 54 Taxes 132, 140-141 (March 1976); U.S. Tax Week, p. 1345, Nov. 7, 1975. When other constructions of a regulation are possible, we should avoid one that renders provisions of the regulations meaningless. Cf. *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 633-634 (1973); *United States v. Campos-Serrano,* 404 U.S. 293, 301 n. 14 (1971); *Mercantile National Bank v. Langdeau,* 371 U.S. 555, 560 (1963); *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307-308 (1961); *United States v. Menasche,* 348 U.S. 528, 538-539 (1955); *Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208 (1932); 2A Sutherland, Statutory Construction, sec. 46.06 (4th ed. by Sands, 1973).

Unfortunately, the term "dummy" has no precise meaning, but as the majority recognizes, the regulations adopted the language from *Glensder Textile Co.,* 46 B.T.A. 176 (1942). The Board stated that, under certain circumstances, the resemblance of the limited partnerships, as generally known then, to corporations might be so substantial "as to justify classification of the limited partnerships as corporations." 46 B.T.A. at 183. The Board then suggested such circumstances:

If, for instance, the general partners were not men with substantial assets risked in the business, *but were mere dummies without real means acting as the agents of the limited partners,* whose investments made possible the business, *there would be something approaching the corporate form of stockholders and directors.* But, as a practical matter, to suppose such a situation we must also suppose that the limited partners were, in reality, not merely silent partners without control of affairs but *were empowered to direct the business actively through the general partners.* We suggest this possibility merely to show that designating a partnership as of a particular kind involves no more than applying a particular name, *and that the really vital thing, the rights and duties of the*

*partners as between themselves and the public, may vary as much as the legislatures* of the several states may think fit to allow.

　　* * *

Nor were the limited partners here able to remove the general partners *and control them as agents, as stockholders may control directors.* The general partners under powers reserved by the certificates might increase the limited partners, to obtain new money, *but the latter, unlike new stockholders in a corporation, acquire no share in control.*

　　[46 B.T.A. at 183, 185; emphasis supplied.]

These statements from *Glensder* show rather clearly that when the Board spoke of "mere dummies * * * acting as the agents of the limited partners," they did not have in mind a private understanding in which the general partners were merely straw men for the limited partners. The Board had in mind the relationship between a board of directors and the shareholders of a corporation and was looking to State law to ascertain what powers were conferred upon the limited partners. Traditionally, corporate shareholders have the right to vote out the directors, the right to select directors who share their policies, and the right to vote on all questions affecting the basic structure of the corporation, including its merger, consolidation, or sale of all or a large part of its assets. The Board wanted to know whether the limited partners in *Glensder* possessed such rights.

It is true that GHL was not a mere straw man for the limited partners in Mai-Kai and Somis, but it is also true that the limited partners in those organizations possessed rights very similar to those of shareholders in a corporation. As in the case of a board of directors of a corporation and the corporate officers chosen by it, GHL was expected to exercise its discretion in the management of the day-to-day affairs of the enterprises, but the limited partners, through their power to remove GHL, could exercise general control over the policies of the enterprises. In other respects, the limited partners possess the powers with which the Board was concerned in *Glensder.*

In my judgment, since the phrase "merely a 'dummy' acting as the agent of the limited partners" was adopted from the Board's opinion in *Glensder,* we should construe it to have the meaning intended by the Board in that case. By adopting such construction, we avoid rendering the provisions of the regulations to be a nullity, and we further their objective of applying the resemblance test by comparing the characteristics of these organizations with those of corporations.

### 3. *Continuity of Life*

Although I agree with the majority's conclusion that Mai-Kai and Somis lacked continuity of life within the meaning of the regulations,[2] I do not agree with their reasons for that conclusion. Their conclusion is based on the finding that bankruptcy of the general partner would cause a dissolution of each of the organizations. They reason that since CULPA does not expressly deal with the effect of bankruptcy, CUPA is applicable (sec. 15006 (a)), and that since under CUPA, bankruptcy does cause the dissolution of a general partnership, it would have the same effect on a limited partnership.

The majority's analysis, in my opinion, fails to take into consideration the effect of section 15520 of CULPA, which provided for the years in issue:

The retirement, death, insanity, removal or failure of reelection of a general partner dissolves the partnership, unless the business is continued by the remaining general partners and/or the general partner or general partners elected in place thereof
  (a) Under a right so to do stated in the certificate, or
  (b) With the consent of all members.

Such provision is similar to section 20 of ULPA, except that California added "removal or failure of reelection" of a general partner. There are no California cases passing on whether the additional language covers bankruptcy, but obviously, the phrase "removal * * * of a general partner" is broad enough to include a removal because of bankruptcy. The majority dismisses such possible interpretation by suggesting that the removal of a partner because of bankruptcy and its replacement would cause a hiatus in the existence of the organization, but a hiatus may arise whenever there is a retirement, death, or insanity of a general partner, followed by the election of a new general partner. In view of the breadth of section 15520 of CULPA, it seems reasonable to conclude that California meant to establish a procedure whereby the limited partnership could prevent its dissolution whenever a general partner was removed from office for any reason.

---

[2] However, it may be persuasively argued that, on the record in this case, there was, realistically, continuity of life within the meaning of *Morrissey v. Commissioner,* 296 U.S. 344 (1935). On this record, the possibility that the bankruptcy of the general partner would affect the continuity of the organizations is minimal and hardly distinguishable from the situation that would exist when a corporation becomes bankrupt.

Yet, for other reasons, the majority's conclusion is correct under the regulations. Section 301.7701-2(b)(1), Proced. & Admin. Regs., provides, in part:

If the retirement, death, or insanity of a general partner of a limited partnership causes a dissolution of the partnership, unless the remaining general partners agree to continue the partnership or *unless all remaining members agree to continue the partnership, continuity of life does not exist.* See Glensder Textile Company (1942) 46 B.T.A. 176 (A., C.B. 1942-1, 8). [Emphasis supplied.]

In *Glensder,* the agreement of all of the remaining general partners to continue the business was necessary to prevent the dissolution of the limited partnership. However, the Board's explanation indicates that it would reach the same conclusion whenever an agreement of some or all of the remaining partners is necessary to avoid dissolution. The Board said:

A contingent continuity of existence had been provided for by the reservation in the certificate of the power of the surviving general partners to continue the business on the death, retirement, or incapacity of a general partner. We do not think this analogous to the chartered life of a corporation which continues regardless of the death or resignation of its directors or stockholders. A limited partnership is dissolved by death, as an ordinary partnership, unless the right to continue is retained, *but continuity is not assured by this power, for it is one vested in the several general partners, apparently, and not in the partnership as an entity. Continuance will be certain only if the remaining general partners agree to it, as would be the case, in substance, in a general partnership.* In an ordinary partnership, on the death of a partner a new partnership is formed; here the old partnership continues but receives new life, in effect, from the decision of the members. * * * [46 B.T.A. at 185; emphasis supplied.]

Under *Glensder,* there is no continuity of life whenever an organization's continuity is contingent, and if its continuity depends upon the agreement of remaining partners, it is contingent, irrespective of whether all, or merely a majority, of the remaining partners must agree. See Storrer, "Limited partnership v. association: a need for change," 5 Tax Adviser 582, 585 (1974); Fox, "The Maximum Scope of the Association Concept," 25 Tax L. Rev. 311, 324-325 (1970). In the case of Mai-Kai, dissolution could be avoided by an agreement of 100 percent of the limited partners, and in the case of Somis, a majority of the limited partners could prevent dissolution. In either event, the continuation of the organization depended upon the agreement of some or all of the limited partners, and consequently, continuity was contingent. For this reason, both

organizations lack continuity of life within the meaning of the regulations and *Glensder.*

DRENNEN and STERRETT, *JJ.,* agree with this dissent.

QUEALY, *J.,* dissenting: I do not question that a literal application of respondent's regulations would require me to concur with the opinion of the majority. However, I am unwilling to be bound by regulations which are patently erroneous, even though respondent may not be prepared to disaffirm those regulations. I think it is the duty of the Court to decide a case in accordance with the law, and where the law is clear, the regulations must give way to the law.

That the law is clear is amply evidenced by the fact that the original opinion in this case was adopted after review by the Court. *Phillip G. Larson,* docket Nos. 5530-72, 5266-73, 5267-73, opinion filed Oct. 21, 1975, and withdrawn Nov. 7, 1975. By inference, at least, even petitioner's counsel would seem to concede that in the absence of the so-called "Kintner regulations" these limited partnerships would be taxable associations.[1] Nor do I believe that there can be any dispute with respect to the absurdity of the "Kintner regulations."

From the outset, the Congress has applied the tax on corporations, organized as such under an act of Congress or the laws of the various States, to other forms of transacting business having similar characteristics. See the Corporation Tax Act of Aug. 5, 1909, ch. 6, sec. 38, 36 Stat. 11, 112. Following the adoption of the 16th amendment, a tax on income was first enacted as section II of the Tariff Act of Oct. 3, 1913, ch. 16, sec. G, 38 Stat. 114, 172. In that act, the normal tax imposed on individuals was likewise imposed on the incomes of "every corporation, joint-stock company or association, and every insurance company, organized in the United States, no matter how created or organized, not including partnerships."

Similar language appeared in section 10 of the Revenue Act of 1916. Beginning with the Revenue Act of 1918, there was initiated the practice of defining separately the various terms used in the act. Section 1 of that act provided, in part, "The term 'corporation' includes associations, joint-stock companies, and

---

[1] Petitioner's opening brief, pp. 26-28. See *Bloomfield Ranch v. Commissioner,* 167 F.2d 586 (9th Cir. 1948).

insurance companies." Substantially the same provision has been carried forward in subsequent revenue acts and appears virtually unchanged as section 7701(a)(3) of the 1954 Code.[2]

Section 7701(a)(2) defines "partnership" and "partner" for the purposes of the Internal Revenue laws as follows:

(2) PARTNERSHIP AND PARTNER.—The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

Section 7701(a)(3) further defines a "corporation" for purposes of the Internal Revenue laws to include other forms of organizations described as follows:

(3) CORPORATION.—The term "corporation" includes associations, joint-stock companies, and insurance companies.

Accordingly, the taxation *as a separate entity* of business ventures is not limited to those enterprises which may be formally chartered as corporations under the laws of various States. Conversely, a "partnership" is defined to include various forms of association which are not, within the meaning of the revenue laws, trusts, estates, or corporations. Thus, depending upon their characteristics, business trusts, partnerships, and other forms of association may be taxable as corporations.

The determination whether the limited partnership agreements in these proceedings gave rise, in fact, to a taxable association within the meaning of section 7701(a)(3) is not controlled by State law. *Commissioner v. Tower,* 327 U.S. 280 (1946); *Burk-Waggoner Association v. Hopkins,* 269 U.S. 110 (1925). It is a question which must be decided within the context of the Internal Revenue laws, giving effect to the intent of the Congress as embodied in those laws. *Morrissey v. Commissioner,* 296 U.S. 344 (1935); *Swanson v. Commissioner,* 296 U.S. 362 (1935); *Helvering v. Combs,* 296 U.S. 365 (1935); *Helvering v. Coleman-Gilbert Associates,* 296 U.S. 369 (1935).

The principles to be considered in determining whether an association or partnership should nevertheless be taxable as a corporation were enunciated in *Morrissey v. Commissioner,*

---

[2] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

*supra,* and have been further defined and implemented in the current regulations.[3]

Section 301.7701-2(a)(1), Proced. & Admin. Regs., sets forth the major characteristics of taxable associations as enumerated in the *Morrissey* case. These characteristics consist of (1) associates, (2) joined together to carry on a business and divide the gains therefrom, (3) with continuity of life, (4) centralization of management, (5) limited liability, and (6) transferability of interests. The regulations then proceed to eliminate from consideration those characteristics which are common both to partnerships and to corporations as not being material in attempting to distinguish between a taxable association and a true partnership, leaving for consideration continuity of life, centralization of management, limited liability and transferability of interest.

In setting forth the criteria to be applied in determining whether an organization formed as a limited partnership possesses the requisite characteristics which would make such an organization more nearly akin to a corporation, the regulations are bottomed on the proposition that a limited partnership organized under the Uniform Limited Partnership Act cannot be taxable as an association.[4] For example, the regulations state that "a limited partnership subject to a statute corresponding to the Uniform Limited Partnership Act" lacks continuity of life. Sec. 301.7701-2(b)(3), Proced. & Admin. Regs. Again, the regulations state that "limited partnerships subject to a statute corresponding to the Uniform Limited Partnership Act, generally do not have centralized management." Sec. 301.7701-2(c)(4), Proced. & Admin. Regs. The regulations state that "in the case of a limited partnership subject to a statute corresponding to the Uniform Limited Partnership Act, personal liability exists with respect to each general partner," with certain very limited

---

[3] T.D. 6503, 1960-2 C.B. 409, intended to counteract the decision in the U.S. Court of Appeals for the 9th Circuit in *United States v. Kintner,* 216 F.2d 418 (9th Cir. 1954). See *Kurzner v. United States,* 413 F.2d 97 (5th Cir. 1969).

[4] In contrast, the regulations which preceded the "Kintner regulations," contained the following caveat:

(b) The Uniform Limited Partnership Act has been adopted in several States. A limited partnership organized under the provisions of that Act may be either an association or a partnership depending upon whether or not in the particular case the essential characteristics of an association exist.

Sec. 39.3797-5(b), Income Tax Regs. 118.

exceptions. Sec. 301.7701-2(d)(1), Proced. & Admin. Regs.[5] In section 301.7701-3(b)(2), example (2), the regulations then indicate that if the limited partnership lacks two of the four enumerated characteristics it is not more nearly akin to a corporation than it is to something else.

As a practical matter, no partnership would fail to meet the test prescribed in the regulations in order to avoid being taxed as an association, whether formed under the common law, the Uniform Limited Partnership Act, or the California Uniform Limited Partnership Act. At least two of the requisite characteristics will always be lacking.

First, with respect to continuity of life, in order to have a partnership you must have a general partner. Regardless of any provision to the contrary, whether by agreement or in accordance with State law, the bankruptcy of a general partner results in the "dissolution" of that partnership. Uniform Partnership Act, secs. 29, 31(5), and 6; Cal. Corp. Code, secs. 15029, 15031(5), and 15006. See also, sec. 5(i) of the Bankruptcy Act, 52 Stat. 845, 11 U.S.C., sec. 23(i); Rowley on Partnership, secs. 31.5 and 46.2 (2d ed. 1960). This does not mean that the remaining partners cannot continue the business. All the term "dissolution" means is that from the standpoint of those doing business with the partnership, its status has been altered. See Uniform Partnership Act, secs. 29-43 and 6; Cal. Corp. Code, secs. 15029-15043 and 15006. See also Rowley on Partnership, secs. 29.1, 30.1, and 46.11 (2d ed. 1960). Cf. Cal. Corp. Code, sec. 15520 (West Supp. 1976). Since respondent's regulations adopt "dissolution" as the sole test in determining whether there is the requisite continuity, no partnership can have continuity of life.

Secondly, under the respondent's regulations, limited liability is lacking unless the general partner has "no substantial assets (other than his interest in the partnership)" *and* is a "dummy." Read literally, the regulations would impose a double-barreled requirement, namely, that the general partner have no assets which can be reached by the creditors *and* be a "dummy." However, the term "dummy" is a word of art in the law. Black's

---

[5] In *Kurzner v. United States,* 413 F.2d 97, 105 (5th Cir. 1969), the United States Court of Appeals for the Fifth Circuit stated that: "Although each of the corporate elements was defined more restrictively, the real stiletto amongst the fronds was the exclusion of entities subject to a partnership act; the prevalence of such acts ensured the exclusion of most professional groups."

Law Dictionary (Rev. 4th Ed. 1968) defines the term at page 591 as follows: "DUMMY, n. One who holds legal title for another; a straw man."

If the sole general partner is, in fact, a "dummy" the limited partners would be liable generally for the debts of the partnership. Uniform Limited Partnership Act, sec. 7; Cal. Corp. Code, sec. 15507. See also *Holzman v. De Escamilla,* 86 Cal. App. 2d 858, 195 P. 2d 833 (1948); Rowley on Partnership, sec. 53.7 (2d Ed. 1960). Their liability would no longer be limited. Therefore, even if the general partner is a "dummy," there could be no limited liability. From this it follows, that under the regulations no partnership would lack the requisite characteristic of limited liability, whether organized under common law, the Uniform Limited Partnership Act, or the California Uniform Limited Partnership Act.[6]

Finally, respondent's regulations go on to state that if two of the requisite four characteristics are lacking, the association is not more nearly akin to a corporation than to some other form of organization and is not taxable as an association within the meaning of section 7701.

I must concede that the opinion of the majority is fully supported by the language of respondent's regulations. I think, however, that the majority would likewise agree that this produces an absurd result. We differ only in whether or not upon the record in this case, the Court is constrained to reach that result. I do not think so.

Although the respondent has not sought to set aside his regulations, and petitioner rests his case strictly on those regulations, I do not believe that this Court should be limited in its decision-making process by an erroneous interpretation of the law. To do so would put us back where we were prior to the decision in *Morrissey v. Commissioner, supra,* wherein the Supreme Court said:

The question is not one of the power of Congress to impose this tax upon petitioners but is simply one of statutory construction,—whether Congress has imposed it. See *Burk-Waggoner Oil Association v. Hopkins,* 269 U.S. 110, 114. The difficulty with the regulations as an exposition was that they themselves required explication; that they left many questions open with respect both to

---

[6] Secs. 39.3797-1 et seq., Regs. 118, which preceded the so-called "Kintner regulations," do not treat the absence of limited liability as determinative. See *Guaranty Employees Association v. United States,* 241 F.2d 565, 571 (5th Cir. 1957).

their application to particular enterprises and to their validity as applied. * * * [p. 356]

In *Morrissey v. Commissioner, supra,* and the companion cases of *Helvering v. Coleman-Gilbert Associates, supra,* and *Helvering v. Combs, supra,* the Supreme Court under varying factual situations made the law which should prevail in these cases. Following the *Morrissey* group of cases, the Treasury Department attempted to conform its regulations to those decisions. For a period of some 25 years, the law was administered and the courts were guided in their decisions by the *Morrissey* group of cases and those regulations. A change in the regulations came about only after the licensed professionals sought to organize as taxable associations and that right was sustained by the courts. See *United States v. Kintner,* 216 F.2d 418 (9th Cir. 1954); *United States v. Empey,* 406 F.2d 157 (10th Cir. 1969). The Treasury Department thereupon revised its regulations in an effort to prevent the proliferation of the professional associations. In reality, what the Treasury set about to do was overrule the *Kintner* decision. In effect, these regulations would set aside or overrule all case law in this field from the *Morrissey* case to the *Kintner* case.

As applied to the professional corporation, the courts have uniformly held invalid much of the current regulations. *Kurzner v. United States,* 413 F.2d 97 (5th Cir. 1969); *O'Neill v. United States,* 410 F.2d 888 (6th Cir. 1969); *United States v. Empey, supra; Smith v. United States,* 301 F. Supp. 1016 (S.D. Fla., 1969); *Cochran v. United States,* 299 F. Supp. 1113 (D. Ariz., 1969); *Wallace v. United States,* 294 F. Supp. 1225 (E.D. Ark., 1968); *Holder v. United States,* 289 F. Supp. 160 (N.D. Ga., 1968).

I see no reason to give any greater weight to these regulations where the position of the parties is reversed, and it is the taxpayer who claims that the association should not be taxable as a corporation. While the promulgation of a ruling predicated on the Uniform Limited Partnership Act as the sole criterion might serve the convenience of the administrative agency—in addition to excluding most professional associations—it is clearly incompatible with the decision in the *Morrissey* case. The regulations cannot obviate the necessity of considering the basic question involved, namely, whether the association *in fact* more nearly resembles a corporation than it does a trust or partnership.

The fact that the Treasury has not seen fit to change its regulations, where those regulations admittedly are predicated upon erroneous concepts, should not serve to limit the right of this Court to consider the broad question whether these and similar limited partnerships are taxable as associations within the principles established in cases such as *Morrissey v. Commissioner, supra; Helvering v. Coleman-Gilbert Associates, supra; Helvering v. Combs, supra;* and *Commissioner v. Tower, supra.*

Even assuming otherwise, however, I do not believe that Mai-Kai and Somis meet what appears to be a condition precedent to the application of those regulations. The California Uniform Limited Partnership Act is not a statute "corresponding" to the Uniform Limited Partnership Act. There is a substantive difference in the provisions relating to the election and removal of the general partner.

Under the California Uniform Limited Partnership Act, a bare majority of the limited partners may remove or expel the general partner and in such event, or in event of the retirement, death, or insanity of the general partner, may elect a new general partner thereby avoiding dissolution of the partnership. Cal. Corp. Code, secs. 15502(1)(a)(XV), 15507(b)(I), and 15520. These provisions are mandatory. See Cal. Admin. Code, tit. 10, sec. 260.140.116.2. No comparable provisions may be found in the Uniform Limited Partnership Act.

The petitioners contend that these provisions in the California statute for the election, removal, or replacement of the general partner by a majority vote of the limited partners are merely declaratory of the rights which a limited partner may be granted under the Uniform Limited Partnership Act. However, the California statute provides for the granting of such rights—i.e., "control"—without subjecting the limited partners to liability as general partners. It is this basic distinction between the rights of the limited partners under California law and the rights of limited partners under the Uniform Limited Partnership Act upon which respondent relies in these cases. This distinction relates to a matter of substance.[7]

Where provision is made either by law or in the partnership agreement for the substitution of a general partner by a vote of a

---

[7] When the question of comparability of the California statute to the Uniform Limited Partnership Act was challenged by the respondent, the California legislature promptly amended its statute.

majority of the limited partners in the case of death, disability, resignation, or bankruptcy of the general partner, there is greater continuity than if the association would be terminated or dissolved in such event.

Even more significantly, where the general partner may be removed by a vote of the limited partners, or the partnership may be dissolved and liquidated by a vote of the limited partners, the role of the limited partners is more nearly akin to that of the shareholders in a corporation and, a general partner whose authority may be taken away by a stated percentage of the limited partnership interests becomes more closely akin to a "manager," rather than a "principal."

In effect, under the California statute the role of the general partner in a limited partnership is reduced to that of an elected manager. There exists the same representative management as in the case of a corporation.[8] Any lack of transferability of interest loses its significance. A manager cannot transfer his job. Furthermore, such an elected manager provides the requisite centralized management, regardless of his share in the business, which in this case was wholly contingent on the results of his efforts.

In determining whether these limited partnerships are taxable as associations, the Court must also look to the association "as a whole," not solely to any formalistic standards. *Morrissey v. Commissioner,* 296 U.S. 344 (1935).[9] We should not be confused by "labels." A partnership within the meaning of section 7701(a)(2) is not so defined. Thus the term embraces a syndicate, group, pool, joint venture, or other unincorporated organization which is not "a trust or estate or a corporation." Therefore, we must look to what the Congress intended by the all-inclusive definition of a corporation under section 7701(a)(3).

---

[8] Petitioners would liken the interest of GHL to that of a common shareholder in a corporation whose interest is subordinated to the preferred shareholders, in this case the limited partners. Petitioners' reply brief states (p. 71):

"Like common stock, GHL's interest gave it an interest in the partnership capital, subordinate to the 'preferred' interests in the partnership: GHL was entitled to a share of the net proceeds from the disposition of the partnership assets or liquidation of the partnership, assuming the terms of the subordination provisions were met. And like preferred stock, the limited partners' interests gave them first call upon the partnership cash flow until they had received a specified return. But the fact that there were differences in the preferences given to the various partnership interests does not render GHL's interests illusory. Rather the Court must determine whether, taking the subordination provision into account, GHL still had a substantial stake in each venture."

[9] This was the rationale of the regulations prior to the promulgation of the so-called "Kintner regulations." (See sec. 39.3797 et seq., Regs. 118.)

It must be remembered that at the time provision was first made for taxing unincorporated associations as corporations, the limited partnership as it is known today was not in existence. The Congress primarily had in mind taxing the business (or Massachusetts) trust as a corporation. This type of association was developed by reason of the restrictions in Massachusetts with respect to the holding of real property by a corporation.[10]

While the associations with which the Court is concerned in this case were organized under the California Uniform Limited Partnership Act and may be referred to as "limited partnerships," in substance these associations are indistinguishable from the Massachusetts or business trusts to which the provisions for taxing certain "associations" as corporations were initially directed.[11] The only difference is the substitution of a corporation, organized for that purpose, as general partner in lieu of the trustee. The "general partner" was nevertheless charged with a "trust," or fiduciary obligation. *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928); *Wind v. Herbert,* 8 Cal. Rptr. 817 (2d Dist. Ct. App. 1960); *Nelson v. Abraham,* 29 Cal. 2d 745 (1947).

In other respects, these limited partnerships more nearly resemble the corporate form than the business or real estate trusts which have been held to be taxable as corporations since the inception of the provision. E.g., *Burk-Waggoner Association v. Hopkins, supra; Swanson v. Commissioner, supra; Helvering v. Coleman-Gilbert Associates, supra; Mid-Ridge Investment Co. v. United States,* 324 F.2d 945 (7th Cir. 1963); *United States v. Stierwalt,* 287 F.2d 855 (10th Cir. 1961); *Mullendore Trust Co.*

---

[10] In Henn, Law of Corporations, p. 86, (2d ed. 1970), the origin of the business trust is described as follows:

"The business trust (otherwise known as 'Massachusetts trust' or common-law trust or voluntary or business association founded under a deed or declaration of trust) is an unincorporated business association set up by a declaration of trust. It resembles somewhat the English joint-stock company established by deed of settlement to trustees.

"The business trust was developed in Massachusetts from 1910 to 1925 to achieve limited liability and to avoid restrictions then existing there on a corporation's acquiring and developing real estate, by adoption of the trust device developed in the English chancery courts in the 16th century. As such, it perpetuated a tradition in the exercise of equitable ingenuity: (a) by the invention of the use as early as the 11th century; (b) then, by the development of the trust after the enactment of the Statute of Uses in 1535; and (c) by the creation of the business trust a half century ago—a tradition carried on by (d) the modern investment trusts, and (e) the real estate investment trusts (REIT)." [Fn. ref. omitted.]

[11] "The status of passive shareholders in a limited business trust has some analogy to the status of limited partners under the Uniform Limited Partnership Act * * *." Ballantine Corporations, 22 (Rev. ed., 1946).

*v. United States,* 271 F.2d 748 (10th Cir. 1959); *Main-Hammond Land Trust v. Commissioner,* 200 F.2d 308 (6th Cir. 1952), affg. 17 T.C. 942 (1951); *Bloomfield Ranch v. Commissioner,* 167 F.2d 586 (9th Cir. 1948); *Marshall's Heirs v. Commissioner,* 111 F.2d 935 (3d Cir. 1940); *Wellston Hills Syndicate Fund v. Commissioner,* 101 F.2d 924 (8th Cir. 1939); *Title Insurance & Trust Co. v. Commissioner,* 100 F.2d 482 (9th Cir. 1938); *Kilgallon v. Commissioner,* 96 F.2d 337 (7th Cir. 1938); *Trust No. 5833, Security-First National Bank v. Welch,* 54 F.2d 323 (9th Cir. 1931); *Little Four Oil & Gas Co. v. Lewellyn,* 35 F.2d 149 (3d Cir. 1929); cf. *Commissioner v. Gerstle,* 95 F.2d 587 (9th Cir. 1938); *Elmer Irvin Trust,* 29 T.C. 846 (1958); *Huron River Syndicate,* 44 B.T.A. 859 (1941); *Porter Property Trustees, Ltd.,* 42 B.T.A. 681 (1940), affd. 130 F.2d 276 (9th Cir. 1942); *Del Mar Addition,* 40 B.T.A. 833 (1939), affd. 113 F.2d 410 (5th Cir. 1940); *St. Louis Hills Syndicate Fund,* 36 B.T.A. 575 (1937); *Central Republic Bank & Trust Co., Trustee,* 34 B.T.A. 391 (1936).

Whether organized as a partnership, limited partnership, joint venture, or any other type of unincorporated organizations, these ventures have been defined as a "real estate syndicate."[12] As such, these limited partnerships in California are treated much like any other corporation. A limited partnership interest is regarded as a "security" under California law. To a large degree, the sales of interests in such syndicates were subject, under both State and Federal law, to the same regulation as the sale of stock in a corporation.[13]

The limited partnership interests in Mai-Kai and Somis were sold through licensed brokers to their individual customers, just as shares in a corporation are sold. The sale of limited partnership shares became so prevalent that the California legislature enacted specific legislation to regulate the business.[14]

---

[12] As amended, sec. 10251 of ch. 4 of the Business and Professions Code, defined a real estate syndicate as follows:

(a) "Real estate syndicate" means any general or limited partnership, joint venture, unincorporated association, or similar organization (but not a corporation) owned beneficially by no more than 100 persons and formed for the sole purpose of, and engaged solely in investment in or gain from an interest in real property, including, but not limited to, a sale, exchange, trade, or development. *An interest held by a husband and wife shall be considered held by one person.* [Cal. Bus. & Prof. Code sec. 10251(a) (West Supp. 1976).]

[13] Comment, SEC Regulation of California Real Estate Syndicates, 61 Cal. L. Rev. 205 (1973).

[14] Real Estate Syndicate Act, Cal. Stats. 1969, ch. 928, operative Jan. 2, 1970.

Petitioner was permitted to present proof that the determination of the respondent in this case may be inconsistent with private rulings issued in the cases of other limited partnerships formed under the California law. It is well settled that taxpayers may not rely upon private rulings issued upon the basis of requests made and facts submitted by other taxpayers, whether right or wrong. *Goodstein v. Commissioner,* 267 F.2d 127 (1st Cir. 1959), affg. 30 T.C. 1178 (1958); *Weller v. Commissioner,* 270 F.2d 294 (3d Cir. 1959), affg. 31 T.C. 33 (1958) and 31 T.C. 26 (1958); *Gale R. Richardson,* 64 T.C. 621 (1975). See also, *Bookwalter v. Brecklein,* 357 F.2d 78 (8th Cir. 1966); *Minchin v. Commissioner,* 335 F.2d 30 (2d Cir. 1964); *W. Lee McLane, Jr.,* 46 T.C. 140 (1966); *Bornstein v. United States,* 345 F.2d 558 (Ct. Cl. 1965); Rev. Proc. 72-3, 1972-1 C.B. 698, 705.

Finally, petitioners allude to the fact that one of the proposals considered and not adopted by the Ways and Means Committee in its preparation of the Tax Reform Bill of 1975 was that any partnership registering the sale of partnership interests with the Securities and Exchange Commission be treated as a corporation. See "Committee Member Selections of Proposals for Consideration in First Phases of Tax Reform," House Ways and Means Committee Print (Aug. 26, 1975). No inference can be drawn from this incident. A similar argument was rejected in *Helvering v. Clifford,* 309 U.S. 331 (1940). Rather, comparable legislation enacted by the Congress relating to the "pass through" of income and losses would indicate that the Congress would not have enacted legislation which would permit the deduction of such losses by the limited partners of a real estate syndicate if that matter had been presented for its consideration.

In 1960, Congress enacted special provisions for the taxation of real estate investment trusts. (Secs. 856-858.) [15] In the case of the real estate investment trust, only the "income" is passed through

---

[15] In reporting the bill (H.R. 12559) providing for the special treatment of real estate investment trusts, the Ways and Means Committee said:

"As is pointed out in the next part of this report, H.R. 12559, to the full extent feasible, makes the requirements and conditions now applicable to regulated investment trusts, applicable to the real estate investment trusts. In addition, your committee has also taken care to draw a sharp line between passive investments and the active operation of business, and has extended the regulated investment company type of tax treatment only to income from the passive investments of real estate investment trusts. *Your committee believes that any real estate trust engaging in active business operations should continue to be subject to the corporate tax in the same manner as is true in the case of similar operations carried on by other comparable enterprises.*"[Emphasis added.]

H. Rept. No. 2020, 86th Cong., 2d Sess. (1960), 1960-2 C.B. 819, 821.

to the investor. The losses are not deductible by the individual participants. It is only reasonable to assume that if the same or an even more desirable result could be achieved in the guise of a "limited partnership," the Congress would not have thus restricted the real estate investment trust.

*Without regard to respondent's regulations,* when we look to the manner in which the Mai-Kai and Somis limited partnerships were organized and their "shares" sold, the purpose for which organized, the relationship between the general partner and the limited partners, the relationship of the limited partners to each other, the separability of the association from its limited partner members, and the limitation of liability enjoyed by the limited partners, it is clear that these limited partnerships are in fact more closely akin to a corporation than to a partnership. Such was the opinion of this Court on October 21, 1975, and I see no reason to change my views.